El Pueblo, Demandante y Apelado, v. Crespo, Acusado y Apelante.

Apelación procedente de la Corte de Distrito de San Juan, Sección 2ª., en causa por asesinato en primer grado.

No. 653.—Resuelto en julio 31, 1914.

Asesinato en Primer Grado—Deliberación y Malicia Premeditada—Peso de la Prueba.—En un caso de asesinato en primer grado el peso de la prueba para demostrar que el acusado mató a la víctima deliberadamente y con malicia premeditada recae sobre el Gobierno.

Id.—Premeditación y Deliberación—Insuficiencia de la Prueba.—Cuando, como en el caso de autos, se presenta prueba para demostrar que la víctima llevaba alhajas o dinero y que, algunos días antes de morir, el acusado le pidió que le permitiera llevar un arma, a lo cual ella accedió, e inmediatamente después del delito el herido nada dijo acerca de su dinero, sino que se concretó a pedirle a la primera persona con quien se encontró que le cuidara la mercancía que estaba vendiendo, habiéndose admitido que no existía ningún otro móvil para el crimen, es necesario concluir que el hecho de que el acusado pidiera un arma es compatible con el deseo de proteger a su principal y de protegerse a sí mismo durante los viajes que hacían, y que la prueba en totalidad es compatible también con un accidente, o con una súbita pendencia entre los dos hombres, y en tales circunstancias es claro que los elementos de premeditación y deliberación no han sido probados en este caso.

Id.—Instrucciones al Jurado—Errores Fundamentales—Asesinato en Segundo Grado y Homicidio.—El limitarse el juez sentenciador en este caso a dar instrucciones específicas sobre el delito de asesinato en primer grado y no con respecto al asesinato en segundo grado y al homicidio constituye un error fundamental que exige la revocación de la sentencia.

Id.—Manifestaciones de la Víctima—Res Gestae—Declaración en Artículo Mortis.—La víctima en este caso le encargó a la primera persona con quien se encontró después de la puñalada que le vigilara la quincalla, pero poco después le manifestó que había recibido una puñalada, y al ser preguntada contestó que Josefino Crespo se la había dado. Se resolvió que tal prueba era admisible como parte de la *res gestæ* y que el Fiscal no podía sostener en apelación que tal prueba era admisible como una declaración en *artículo mortis,* porque cuando dicha prueba fué objetada en el tribunal sentenciador, el Fiscal que acusaba manifestó que la ofrecía como parte de las *res gestæ.*

Id.—Res Gestae—Apreciación del Tribunal—Funciones del Jurado.—El determinar si una parte de la prueba constituye o no parte de las *res gestæ* corresponde al tribunal y el jurado tiene derecho a considerar esa parte de la prueba en conjunto con toda la prueba presentada en el caso.

Id.—Instrucciones al Jurado—Prueba Circunstancial.—En casos que dependen de prueba circunstancial la corte debe instruir al jurado acerca de la

naturaleza de dicha prueba, y cuando, como en el caso de autos, solamente parte de la prueba tiene ese carácter, el juez en sus instrucciones debe aclararlo.

ID.—INSTRUCCIONES AL JURADO—SILENCIO DEL ACUSADO.—Constituye un error fundamental el decir el juez en las instrucciones al jurado que el acusado no había dicho nada, ni había explicado a ellos cómo el delito fué cometido, pues esto pudo inducir al jurado a creer que era necesario que el acusado presentara prueba explicando su conducta.

Los hechos están expresados en la opinión.

Abogado del acusado: *Sr. José de J. Tizol.*

Abogado del Pueblo: *Sr. Charles E. Foote, Fiscal.*

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

La acusación en este caso dice lo siguiente:

"El Fiscal formula acusación contra Josefino Crespo, por un delito de asesinato en primer grado (*felony*) cometido como sigue: 'El citado Josefino Crespo, allá el día 17 de junio de 1912, en la jurisdicción de Río Grande, que forma parte del Distrito Judicial de San Juan, ilegal, voluntaria, y maliciosamente, y de una manera alevosa, deliberada y premeditada, acometió y agredió con un cuchillo a Tomás Comas con intención de matarlo infiriéndole una herida penetrante en la región lumbar izquierda, seccionándole el intestino grueso en el colón lumbar, las asas del delgado y las arterias y venas de la red del peritoneo; la que le produjo la muerte a los pocos momentos. Este hecho es contrario a la ley para tal caso prevista y a la paz y dignidad de El Pueblo de Puerto Rico. Jaime Sifre, Asst. Fiscal del Distrito.' La acusación que antecede está basada en el testimonio de testigos examinados bajo juramento, creyendo solemnemente que existe junta causa para presentarla al tribunal. Jaime Sifre, Asst. Fiscal del Distrito. Jurado y firmado ante mí hoy día 27 de julio de 1912. R. Díaz Collazo, Sub-Secretario del Tribunal de Distrito de San Juan."

Después de celebrado el juicio por jurado, el acusado fué declarado culpable de asesinato en primer grado y sentenciado a ser colgado.

El apelante alega nueve errores en apoyo del recurso. En ninguno de ellos se le llama la atención a esta corte directamente al error fundamental en este caso aun cuando tal error ha sido indicado en la argumentación oral por parte del ape-

lante de las instrucciones de la corte al jurado. Consiste este error fundamental del caso en la carencia de prueba para probar un caso de asesinato en primer grado. La prueba es la siguiente:

"TOMÁS CARDONA declaró: que estando trabajando el día 17 de junio en la finca del Sr. Nicolás García, en el barrio de Sabana, de Río Grande, vió pasar por allí hacia arriba, como entre 7 y 8 de la mañana y a distancia de dos o tres cuerdas, a Tomás Comas, que llevaba una maleta, yendo acompañado de otra persona que no conoce, pero que llevaba otra maleta.

"DOLORES RIVERA declaró: que allá el día 17 de junio, por la mañana, trabajaba en la finca de Nicolás García, en el barrio de Sabana, de Río Grande, apareado con Tomás Cardona, cuando vió pasar entre 7 y 8 de dicha mañana a Tomás Comas, acompañado de un jovencito de color blanco, de cuerpo regular, a quien no conocía, pero el que le presentaron más tarde y era el mismo. Señalando al acusado contestó al Fiscal que ese será el individuo que iba con Tomás Comas; que se le parece. Que ellos iban para allá, y que uno llevaba una canasta y el otro una maleta; y que el día que pasó Tomás Comas con ese otro individuo, lo anormal que sucedió en el barrio fué que mataron a Tomás Comas, y que recuerda ese día.

"JESÚS MERCADO 1°. declaró: que en el mes de junio vivía en la propiedad de D. Nicolás Carcía, que está en el barrio Sabana, de Río Grande, cerca de Luquillo, y en donde trabajaba acompañado de un hijo suyo llamado Jesús Mercado 2°. Que mientras trabajaba sintió un grito duro que dijo ¡Ay¡, creyendo que el grito había salido de uno que se había caído de un palo de pana, y por el lado del palo de pana fué que oyó el grito; que su hijo salió mandado por él a ver lo que había pasado; que más tarde fué a su casa y encontró allí a su hijo y a Tomás Comas que estaba sentado en la cama, y después de haberle pedido un vaso de agua a la mujer del testigo cayó para atrás y murió allí de la puñalada que le habían dado por la espalda; que conoce a Josefino Crespo, quien al ser llevado a la casa de D. Nicolás estaba como sorprendido, quedándose allí hasta que llegaron los guardias; que vió el cuchillo con que hirieron a Comas, siendo un cuchillo grande y estaba lleno de sangre.

"JESÚS MERCADO 2°. declaró: que vivía en el mes de junio en el barrio de Sabana; que en la mañana del día 17 de dicho mes salió a trabajar con su padre a una finca de Nicolás García, y como entre 8 y 9 de la mañana sintió unos gritos, y le dijo a su padre: 'Papá,

oiga lo que pasa,' y por mandato de su padre se dirigió a su casa porque creyó que había sido una hermana suya que se había caído del palo, y al llegar a su casa se encontró a una hermanita que lloraba, la que le dijo que Tomás Comas había llegado herido; que Tomás Comas estaba en el catre de su mamá; que Nicolás García le dió orden de que cogiera una bestia y fuera al pueblo a dar cuenta; y cuando fué a coger la bestia sintió un ruido por unas matas, y vió a un individuo que iba sin sombrero y se dirigió hacia él, lo empuñó y preguntándole como se llamaba le contestó que Josefino; que entonces le dijo que iba a llevarlo a la casa porque el difunto había dicho que Josefino lo había matado, llegando en eso Nicolás García, y entre ambos lo llevaron a la casa. Preguntado por el fiscal si ese individuo a que se refiere está en la sala, contestó que sí, señalando al acusado. Que cuando el testigo llegó a la casa, Tomás Comas ya había muerto. Preguntado sobre si el acusado hizo alguna manifestación sobre que él no era quien cometió el hecho, manifestó que el acusado se quería ir y decía; 'Aflójeme, que yo no soy.' Que como a los 20 ó 25 días del hecho encontró en el monte la vaqueta del cuchillo que estaba escondida, y una libreta que tenía unas cartas dentro, tapadas con basura, y lo que entregó al dueño de la propiedad. Presentádale por el Fiscal la vaqueta, la reconoce. Que antes del hecho había visto a Josefino Crespo que andaba con Tomás Comas; que su mamá le dijo que el difunto le había declarado a ella antes de morir que había sido Josefino.

"NICOLÁS GARCÍA declaró: que allá en el mes de junio vivía en el pueblo de Luquillo y tenía una finca en Sabana; que Tomás Cardona, Dolores Rivera, Jesús Mercado 1º., y Jesús Mercado 2º., son peones suyos; que el día 17 de junio estando volteando su finca oyó unos gritos que decían !Ay¡ tía, que me han matado, me han dado una puñalada, ¡Ay! tía, avance!; que miró y vió a un individuo corriendo que subía por el cercado de alambre con dirección al monte, y cuando el testigo llegó a la casa encontró a Tomás Comas en un catre, que tenía una puñalada por detrás de donde le salía poca sangre; que Tomás Comas se dedicaba a la quincalla y llevaba de peón a un tal Josefino Crespo, que es el acusado; que al llegar a la casa Tomás Comas, ya moribundo, manifestó delante de la señora y de él que quien lo había herido había sido su peón Josefino Crespo, muriendo como a los tres o cuatro minutos; que en seguida salió en busca del individuo que había visto corriendo hacia el monte y encontró a Jesús Mercado con un individuo empuñado, Josefino Crespo, quien hacía resistencia, y le llevaron a la casa, estando en actitud violenta, como que quería escaparse. Que cuando el testigo llegó

a la casa encontró ·el cuchillo que estaba encima de la maleta, y lo ocupó, entregándoselo a la señora con la maleta para que lo guardara. Que cuando llegó donde estaba Josefino Crespo éste le dijo que él no había sido quien había herido a Tomás Comas, que él iba en persecución del que le había dado la puñalada, que era un negro que iba vendado. Que cuando llevaron a Josefino Crespo a la casa donde estaba Tomás Comas, se puso el sombrero del muerto diciendo que era de él, y el declarante le dijo que no, y después se encontró el sombrero de él al lado de un tocón, que es un sombrero de burro. Reconoce el sombrero que llevaba Josefino Crespo y el cuchillo que tenía cabo negro. Que el cuchillo, cuando lo vió en la casa, estaba lleno de excremento hasta el cabo. Que cuando llegó a la casa y encontró al herido éste lo que le dijo es: 'Don Nicolás, Josefino Crespo, mi compañero, me ha dado una puñalada' y en aquellos momentos tenía su conocimiento, pero enseguida fué que murió. Que antes del hecho había visto a Josefino Crespo en el pueblo en unión de Comas; *que entre el tiempo que oyó el grito, llegar a la casa y encontrar a Tomás Comas allí pasaron como tres o cuatro minutos, habiendo como una cuerda, próximamente, del punto donde estaba el excremento a la casa.* Reconoce, al serle mostrado por el Fiscal, un pantalón como el que llevaba puesto Josefino Crespo el día del hecho, e indica el sitio donde tenía unas manchas de excremento, cuyo pantalón, ofrece el Fiscal como prueba para corroborar la declaración del testigo, y para demostrar que después que dió la puñalada se limpió en la parte trasera·

"MONSERRATE COMAS declaró: que es policía insular, que Tomás Comas era su hermano y que conoce a Josefino Crespo, quien desde hacía algún tiempo era peón de su hermano que se dedicaba a la quincalla. Que a principios del mes de junio o último de mayo de 1912, su hermano portaba un cuchillo y un revólver, que cree era un *bulldog,* y el cuchillo grande de cabo negro, cuyas armas llevaba en la canasta. Que una noche, todavía el testigo no era policía insular, su hermano se encontraba en su casa y le dió a contar un dinero, hasta 1,500 pesos, y entonces Josefino Crespo le pidió una de las armas, diciéndole que para qué necesitaba dos, que le diera una, y su hermano le dijo: 'Coge cualquiera; puedes coger el cuchillo o el revólver, el que quieras,' y Josefino Crespo le dijo: 'Yo cojo mejor el cuchillo.' Que esto del cuchillo pasó como diez o doce días antes del hecho. · El Fiscal lo presenta al testigo y lo reconoce. Que dicha arma fué entregada por su hermano a Josefino Crespo en presencia del testigo. Que el motivo porque le contó a su hermano los 1,500 pesos fué porque le dijo: 'Tanto tiempo trabajando y todavía estás

bruja?', y dice: 'No; tengo algunos chavitos,' él dijo: '¿Como cuánto dinero tendrás?' y dice: 'Cuéntalos' y los contó. Que el dinero lo llevaba en uno de los bolsillos de atrás en un paquete, y siempre andaba con ese dinero. Que parece que su hermano llevaba amores con una hermana de Josefino, y debido a esta circunstancia tenía colocado a Josefino, a quien en dos o tres ocasiones le había dicho que no lo necesitaba. Que anteriormente Josefino y su hermano habían tenido un disgusto, pero que eso había pasado a la historia. Que varias noches Josefino convidó a salir a su hermano, pero que su hermano, como portaba esa cantidad, no quería salir de noche. Que cuando murió su hermano, el testigo estaba de policía en Juncos, y que no ha podido encontrar los 1,500 pesos, porque el acusado estuvo más de un cuarto de hora dentro del monte y tuvo tiempo de guardarlos.

"CARLOTA MERCADO declaró: Que vive en Luquillo; que en el mes de junio vivía en Sabana; que conoció a Tomás Comas, quien se dedicaba al trabajo de azada y luego, el de quincalla; que a Josefino Crespo lo conoce de vista. Preguntada si el que acompañaba a Tomás Comas está aquí, contestó afirmativamente, señalando al acusado. Que lo que ocurrió el día 17 de junio fué que mataron a Tomás Comas. Que estando la declarante en su casa salió a la ventana por la mañana, entre 8 y 9, porque sintió gritos duros que decían ¡Ay!. Que miró y vió venir corriendo a Tomás Comas, quien la vió y dijo: 'Ven, alcánzame, toma este cuchillo y llévalo a tu casa y búscame la quincalla que está debajo del palo de pana.' Que la declarante cogió el cuchillo y fué al palo de pana a buscar la quincalla, y había allí una maleta que tenía excremento encima, la cual trajo a su casa, y cuando llegó ya Tomás Comas había muerto; que tardó poco en volver con la maleta, porque entre el sitio donde estaba y la casa hay como una cuerda; que el cuchillo lo puso encima de la maleta, el cual era grande, de cabo negro, y estaba sucio con sangre y excremento; que no vio la herida ni sabe dónde la tenía, y que Tomás Comas murió de la puñalada que le dieron. Que vió a Josefino Crespo en la casa ese mismo día, cuando lo llevaron su hermano y D. Nicolás.

"FABRICIANA ROBLES declaró: que vive en el barrio Sabana, de Río Grande; que Carmen Mercado y Carlota son sus hijas; que el día 17 de junio, estando fuera de la casa en una quebrada, sintió gritos en su casa y se acercó y vió que era Tomás Comas; que le preguntó qué le había pasado, y le dijo que le habían dado una puñalada, y entonces le preguntó que quién había sido, contestándole que Josefino Crespo, su compañero; que Comas siguió hasta el

cuarto, se acostó en la cama y murió allí seguido de haberle dicho que Josefino Crespo era el que le había dado la puñalada; que Tomás Comas le enseñó la herida, mostrándole el sitio, y que cuando le hizo la manifestación no había más nadie que D. Nicolás García y ella; que vió a Josefino Crespo cuando lo trajeron a la casa; que el interfecto la llamaba a ella tía, y como no la vió en la casa, en los gritos aclamaba a su tía, diciendo: '¡Ay! tía, que me han dado una puñalada!' Que vió el cuchillo, que era grande, de cabo negro, y lo reconoce al·presentárselo el Fiscal.

"CARLOS GARCÍA DE LA NOCEDA declaró: Que es el Juez Municipal de Río Grande; que en uno de los días del mes de junio fué a Luquillo el mismo día del crimen, y vió a Josefino Crespo; que no le notó nada en sus ropas que le llamara la atención y sí en otra ropa, en un pantalón, notó que tenía excremento, materias fecales, indicando la parte del pantalón en donde las vió, en la parte de atrás; que el testigo se incautó de la propiedad de Comas.

"DR. MIGUEL VEVE declaró: que es médico-cirujano; que conoció a Tomás Comas y a su familia; que allá por el día 17 ó 18 de junio tuvo oportunidad de prestar sus servicios a Tomás Comas, quien no presentaba exteriormente señales de violencia alguna, ni un ligero rasguño, y sí una herida dada en el lado izquierdo, detrás, por instrumento cortante bastante ancho en su base; el filo seguramente era hacia delante, y el instrumento bastante largo, de 9 a 10 centímetros; que el arma homicida cortó el colón en su borde esterno e hirió los intestinos en distintas partes, motivando un sinnúmero de heridas y al mismo tiempo la rotura de venas, produciendo una hemorragia interna, cosa muy segura, por haber sido recibida la herida precisamente en el más frondoso árbol arterial; que a Tomás Comas le produjo la muerte la herida recibida; que la posición en que ha debido estar Tomás Comas en relación al agresor al recibir la herida es en un mismo plano, pues no se explica de otra manera, y que Tomás Comas ha debido estar en cuclillas, y el otro también en cuclillas, ligeramente inclinado; que un individuo que recibe una herida así puede andar, y como la hemorragia se produce de una manera lenta, ha podido estar como diez minutos de pie, hablando y andar la distancia de una cuerda; que con más razón puede estar diez minutos de pie, hablando, sobre todo si es cierto lo que dicen que llevaba el cuchillo colocado en la herida; que Tomás tenía una organización fuerte y que pudo conservar sus facultades intelectuales al morir; que esta clase de herida no determina ningún trastorno, sino al contrario, tenía que estar completamente sano del cerebro.

"CELINA MERCADO declaró: Que en el mes de junio vivía en una casa de D. Nicolás García; que conoce a Tomás Comas y a Josefino Crespo, quienes andaban juntos; que ese día, 17, Tomás Comas llegó herido a su casa, y la testigo fué a llamar a su mamá que estaba lavando los paños en la quebrada; que Tomás Comas, cuando llegaba a la casa iba gritando y llevaba un cuchillo que le entregó a su hermana Carlota. Presentádole el cuchillo dice que es el que llevaba Tomás en la mano. Que desde que la testigo vió a Comas, que fué a buscar a su mamá y volvieron, tardó poco tiempo, como 10 minutos, más o menos. Que cuando Comas le dijo a su mamá que quien lo había herido era Josefino Crespo, no había ninguna persona allí, nada más que su mamá y ella, y que entre hacer Comas esa declaración y morir transcurrieron unos 10 minutos."

De la relación anterior de la prueba se deducen los siguientes hechos:

(1) Que Comas recibió una puñalada de manos del acusado Josefino Crespo. Es innecesario el relacionar los hechos particulares por los cuales se llega a esta conclusión, porque es el hecho constitutivo de este caso y al considerar como haremos si la prueba es suficiente, a semejanza de una excepción previa a la prueba, debe darse valor a toda la prueba del Fiscal, y sucede que en este caso no se presentó otra prueba.

Habiéndose demostrado claramente que Comas fué muerto por Crespo, el peso de la prueba recayó sobre el gobierno para que probara que Josefino Crespo deliberadamente y con malicia premeditada, mató a Tomás Comas. Cuando Crespo fué cogido por los dos hombres que lo detuvieron, él estaba escondido y dijo "Aflójenme, que yo no soy." Se presentó prueba para demostrar que Comas llevaba alhajas o dinero. También hubo pruebas para demostrar que como unos diez o doce días antes de morir Comas, le pidió Crespo que le permitiera llevar un arma lo cual se le concedió y él eligió un cuchillo. Ahora bien, el pedir Crespo un arma puede muy bien armonizarse con el deseo de proteger a su principal y a sí mismo durante sus viajes, pues era su sirviente. No existe la más mínima prueba de que Crespo tratara de apoderarse

de parte alguna del dinero que acostumbraba llevar Comas, y se ha admitido que no existe ningún otro móvil para el crimen. De la prueba resulta que Comas inmediatamente después del delito nada dijo de su dinero, sino que pidió a la primera persona con quien se encontró que le cuidara la quincalla que constituía la mercancía que él estaba vendiendo y de la cual obtenía sus medios para vivir. La prueba en conjunto es perfectamente compatible con un accidente o súbita pendencia entre los dos hombres. No discutimos más la prueba porque creemos que es clara para la mente que los elementos de premeditación y deliberación no han sido probados en este caso.

(2) En el octavo motivo del recurso el apelante sostiene que la corte debió haber instruído al jurado con respecto a los grados del delito, además del de asesinato en primer grado, pues las instrucciones del juez al jurado se refirieron únicamente al crimen de asesinato en primer grado. Es verdad, como dice el fiscal en varias partes de su alegato, que el acusado no pidió instrucciones específicas para el jurado, pero esta corte siguiendo el Código de Enjuiciamiento Criminal nunca ha dudado en examinar las instrucciones al jurado para ver si se ha cometido algún error sustancial. Opinamos que existe el error fundamental en no dar instrucciones con respecto al asesinato en segundo grado y al homicidio. No sabemos con exactitud cuál fué la teoría del juez sentenciador con respecto a la deliberación o premeditación. Puede ser que existieran algunos elementos en los cuales él se fijara como demostrativos de tal deliberación o premeditación, pero creemos claro que existe lugar para dudar de la comisión de un asesinato en primer grado por razón de que nadie tiene la menor idea acerca de lo que ocurrió cuando los dos hombres se hallaban solos en el monte. Bajo cualquier aspecto del caso, teniendo en cuenta las circunstancias particulares en que ocurrió la muerte, el acusado tenía derecho a que se instruyera al jurado con respecto a los grados inferiores.

(3) Gran parte del debate jurídico en este caso se refiere a si las manifestaciones hechas por Tomás Comas poco antes de su muerte eran admisibles como prueba. El Fiscal sostiene que tales manifestaciones eran admisibles ya como prueba de las circunstancias constitutivas del delito (*res gestæ*), ya como declaración en artículo mortis (*dying declaration*). No creemos que el Fiscal pueda ante esta corte sostener que esta prueba era admisible como una declaración en artículo mortis, porque cuando el acusado hizo objeción a esta prueba por ser de referencia, el Fiscal manifestó que la ofrecía como prueba de las circunstancias constitutivas del delito. Creemos que el Fiscal arguye con visos de razón que la prueba impugnada era admisible como parte de las *res gestæ*. Es verdad que Comas le encargó a la primera persona con quien se encontró después de la puñalada, que le vigilara la quincalla, pero poco después él manifestó que había recibido una puñalada y al ser preguntado contestó que Josefino Crespo se la había dado. No vemos error alguno en la admisión de esta prueba. Tal vez si el acusado lo hubiera pedido la corte hubiera dado instrucciones al jurado con respecto a lo que podía considerarse como parte de las *res gestæ* en este caso. Por lo demás, como sostiene el Fiscal, el determinar si una parte de la prueba constituye o no parte de la *res gestæ*, corresponde al tribunal y el jurado tiene derecho a considerar esa parte de la prueba en conjunto con toda la prueba presentada en el caso. Las manifestaciones y gritos del moribundo, hechas en tan íntima relación con el suceso principal de espontaneidad y como hemos indicado eran perfectamente admisibles.

(4) Estamos de acuerdo con el apelante que en un caso que depende de prueba circunstancial la corte debe instruir al jurado acerca de la naturaleza de la prueba circunstancial y el fiscal está conforme con esta conclusión. Sin embargo, sostiene que solamente una parte de la prueba era de carácter circunstancial. La corte, por el contrario, se refi-

rió a la prueba como si toda fuera circunstancial dejando lugar a duda el si se refería a toda la prueba, y por eso opinamos que procedía y hasta era necesario instruir al jurado con respecto a la naturaleza de la prueba circunstancial.

(5) También creemos que al decir el juez en sus instrucciones al jurado que la única prueba era la de la acusación porque el acusado no había dicho nada, ni había explicado ante ellos cómo el delito fué cometido, pudo inducir al jurado al error de creer que era necesario que el acusado presentara prueba explicando su conducta; y si bien les instruyó luego que el silencio del acusado no debía servir de elemento para creer en su culpabilidad, sin embargo si el jurado llegó a creer por las instrucciones que el acusado tenía necesidad de explicar lo ocurrido, el perjuicio estaba causado, por lo que tenemos que llegar a la conclusión de que esa parte de las instrucciones fué por lo menos confusa y capaz de producir error en el jurado.

No hemos discutido los errores alegados por el apelante en el orden en que han sido expuestos o planteados, pero sí hemos examinado sustancialmente todos los errores con excepción de uno o dos que no son perjudiciales y que no tienen probabilidades de que ocurran en un nuevo juicio.

Por los errores expuestos y sobre todo porque el caso no demuestra la comisión de un asesinato en primer grado, debe revocarse la sentencia apelada y devolverse el caso para un nuevo juicio.

*Revocada la sentencia apelada y ordenada la celebración de nuevo juicio.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados del Toro y Aldrey.

El Juez Asociado Sr. Hutchison no formó parte del tribunal en la vista de este caso.