EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAMÓN FERNÁNDEZ GONZÁLEZ, acusado y apelante.

No. 5782.—*Sometido:* Noviembre 27, 1935. *Resuelto:* Febrero 18, 1936.

*Carlos D. Vázquez,* abogado del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

El Fiscal del Distrito de San Juan formuló acusación contra Ramón Fernández González imputándole la comisión de un delito de asesinato cometido en Río Piedras el 23 de octubre de 1932, al dar muerte con malicia premeditada al ser humano Carlos del Toro. Alegó su inocencia el acusado y solicitó juicio por jurado. Celebrado el juicio, en marzo 20, 1934, fué declarado culpable de asesinato en segundo grado. Pidió nuevo juicio. La corte negó su petición y lo condenó en abril 30, 1934, a sufrir la pena de diez años de presidio con trabajos forzados. Apeló y en su alegato sostiene que la corte sentenciadora erró al negarse a trasmitir al jurado instrucciones sobre homicidio voluntario y sobre el efecto legal de cierta evidencia voluntariamente suprimida

por el fiscal, al negar la moción de nuevo juicio y al pronunciar su sentencia.

Para la debida resolución de las cuestiones suscitadas, se hace necesario resumir la evidencia presentada por una y otra parte en el juicio.

Por el Pueblo declararon el Doctor Zengotita, Sinforoso, Carmen, Basilio y Francisca Castro, Mateo Lorenzi e Isabelo del Toro.

El primero practicó la autopsia del cadáver de Carlos del Toro que "presentaba una herida . . . que medía como doce pulgadas de diámetro en la región escapulo-clavicular del lado izquierdo." La causa de la muerte fué "la hemorragia que produjo la lesión."

Francisca Castro era la esposa de Carlos del Toro, Sinforoso su padre político y Basilio y Francisca sus cuñados. Todos se encontraban en la casa de Sinforoso situada en el campo, barrio de Cupey, de Río Piedras, donde también vivía Carlos. Sus declaraciones tienden a demostrar que entre nueve y diez de la noche del 23 de octubre de 1932 sintieron que Carlos regresaba. La esposa le abrió la puerta y él le dijo "aguarda un momento que me voy a fumar un cigarrillo" y cuando iba a subir, se le acercó el acusado Ramón Fernández y con su machete le produjo la herida que horas después le ocasionó la muerte, retirándose en seguida.

Los otros testigos Mateo Lorenzi e Isabelo del Toro dicen que en unión del interfecto estuvieron en la tarde del 23 de octubre de 1932 en la casa del acusado donde se cantó y se tomó algún licor, retirándose como a eso de las siete sin que ocurriera disgusto alguno. Que el acusado se les fué detrás y al pasar una quebrada dirigiéndose al interfecto le dijo "a mí me gusta que los hombres me respeten", y le tiró con un palo que llevaba. Intervinieron ellos y todo terminó, llevando Isabelo al acusado a su casa.

Por la defensa declararon María y Francisco Fernández, Pablo V. Ríos, Gilberto Díaz, Jacinto Rodríguez y el propio acusado.

María y Francisco Fernández son hijos del acusado. La primera, que tenía alrededor de catorce años a la fecha del suceso, declaró que Carlos del Toro y sus compañeros entraron sin ser invitados a la casa de su padre donde éste tocaba el cuatro. Carlos, que llevaba un puñal y tenía una botella de ron en el bolsillo, dijo a su padre que tocara y como no lo hiciera, "se molestó y se levantó y le dió a mi hermanito en la rodilla y de momento se paró y me echó mano y me dijo que me fuera para abajo a tener actos carnales . . . entró a decirle palabras malas a papá y éste cogió la tranca . . . y le dió un palo. . . . Cuando le dió, los amigos que andaban con él le dijeron: 'Don Ramón, acuéstese a dormir que nosotros nos vamos', y no sé de más nada.''

Francisco, el hermano, dice que cuando entró Carlos con sus amigos "papá guardó el cuatro viendo que él venía cayéndose. . . Seguido sacó una botella de ron y le brindó a mi papá y papá no quiso. . . Se paró de golpe y le dió una patada al banco y me cogió a mí y cogió a mi hermanita por un pecho y le dijo, vamos a tener actos carnales. . . . Papá al vernos llorando, agarró un palo de trancar la puerta y le dió . . . . Entonces los amigos que andaban con él le dijeron: 'Don Ramón, acuéstese a dormir que nosotros lo llevamos', y papá se acostó a dormir y ellos se lo llevaron.''

Tras sus hijos tomó la silla testifical el propio acusado, manifestando que cuando Carlos y sus amigos llegaron, cogió el tiple y lo guardó. Que Carlos se sentó "a obligarme a tocar. . . Yo no quise tocar . . . y se sentó un rato así . . . y le dió una patada al banco y le dió al niño. . . Le echó mano a mi hijita y le dijo: Para abajo a tener actos carnales. Cogí un palo de trancar y le dí.''

Dijo que "no se fué con ellos. . . . Se quedó en su casa . . . como una hora . . . salió a una tienda a buscar cigarrillos y azúcar . . . y para ella iba cuando oyó a Carlos que lo insultaba y vió que le echaba mano al puñal, diciéndole 'te voy a sentenciar'. . . Me dió un puño . . . y entonces

yo avancé y con un mocho que yo llevaba que venía de picar leña tuve que tirarle con intención de defenderme porque sé que es hombre peligroso."

Refiere que en cierta ocasión Carlos lo hizo tocar a la brava y en otra·le rompió en la cara un güiro. Dijo que Carlos era "hombre turbulento. Dondequiera estaba ofendiendo a la humanidad, no respetaba a nadie."

Al ser repreguntado por el fiscal negó que hubiera declarado previamente. El fiscal llamó repetidamente su atención sobre lo que había declarado ante el Fiscal Quiñones al día siguiente del suceso, limitándose a manifestar que Carlos del Toro le había pegado un puño en el estómago y él se había retirado a su casa a dormir sin salir en toda la noche, omitiendo referirse al incidente de su hija y a la lucha que acababa de decir que tuvo lugar cuando salió a comprar cigarrillos y azúcar, y él insistió en que nada había declarado. El fiscal introdujo luego en *rebuttal* la declaración del acusado prestada bajo juramento el 24 de octubre, 1932, ante el Fiscal Especial Quiñones. Fué admitida con el consentimiento de la defensa.

Los testigos Díaz y Rodríguez declararon sobre la reputación del interfecto. El primero aseguró que era un muchacho que se había criado casi solo, pendenciero, y el segundo dijo, "yo lo veía trabajando pacífico y cuando estaba metido en fiesta no era pacífico."

La declaración de Ríos, que vivía con una hija del acusado, fué al efecto de haber acompañado al cabo Rivera a una investigación sobre los hechos, habiendo estado en la casa de Sinforoso Castro donde Francisca "manifestó a preguntas mías que el esposo de ella le había llamado y le había dicho: 'Francisca dame una daga que este sinvergüenza me ha herido'. . . que no había visto al agresor debido a estar acostados a esa hora."

El acusado pidió a la corte que transmitiera al jurado las siguientes

"INSTRUCCIONES

"1.—Un peligro aparente de recibir grave daño corporal que apareciere así a un hombre prudente, justifica la defensa propia. Pueblo vs. Serrano, 35 D.P.R. 335.

"2.—En este caso el fiscal omitió ofrecer el testimonio de los testigos juramentados, Patricio Encarnación, Pedro L. Miranda y Francisco Ramos y la ley presume que toda evidencia voluntariamente suprimida se presume que es perjudicial a la parte que dejó de presentarla.

"3.—Instrucción sobre homicidio.

"RESOLUCIÓN.—Dada la primera; negadas la 2da. y 3ra. La primera, porque no siempre la supresión de testigos equivale a evidencia voluntariamente suprimida y la 3ra. porque no hay en la prueba nada que autorice tal instrucción de homicidio. . . .

"INSTRUCCIÓN

"Si los señores del jurado llegan a la conclusión de que Ramón Fernández mató a Carlos del Toro, bajo el arrebato de cólera producido por las palabras que el interfecto le dirigiera a su hija, María Fernández, entonces deben rendir un veredicto de Homicidio Voluntario.

"RESOLUCIÓN.—Denegada por no ser coetánea la muerte con el incidente que se pide y relaciona en la instrucción."

Las instrucciones transmitidas contienen un sumario de la prueba y amplios datos sobre el delito de asesinato y sobre la legítima defensa. No hacen referencia al delito de homicidio. Terminan como sigue:

"Si los Sres. del Jurado creen por el resultado de la prueba practicada, y fuera de toda duda razonable, que el acusado Ramón Fernández González dió muerte ilegal a Carlos del Toro con malicia y premeditación, pero sin que en dicha muerte hubiera deliberación, entonces deben Uds. rendir un veredicto de asesinato en segundo grado.

"Si Uds. tienen duda en cuanto a si se cometió el delito de asesinato en primer grado o asesinato en segundo grado, deben Uds. darle al acusado el beneficio de esa duda y declararlo culpable del delito en el grado más bajo.

"Si los Sres. del Jurado por el resultado de la prueba, y fuera de toda duda razonable, entienden que este acusado al quitar en la forma que quitó la vida a Carlos del Toro lo hizo haciendo uso de

legítima defensa, de acuerdo con las instrucciones que les dí, deben Uds. darle al acusado el beneficio de la legítima defensa y declararlo no culpable.

"Y por último, si Uds. entienden de acuerdo con esta prueba practicada que ésta no fué la persona que hirió a Carlos del Toro, entonces deben Uds. declarar al acusado no culpable del delito de que se le acusa."

En la moción de nuevo juicio insiste la defensa en su actitud en relación con las instrucciones al jurado. Insistió la corte de igual modo en su criterio, como sigue:

"El arrebato de cólera que puede invocarse por el acusado para rebajar un delito de asesinato al grado de homicidio, debe ser coetáneo con el hecho de la muerte. De otro modo existe la premeditación. Si no hay prueba que justifique una *instrucción de homicidio* debe negarse. No debe el tribunal en sus instrucciones llevar a la mente del jurado nada que no esté sostenido por la prueba. Hacer lo contrario, no hay duda que favorece al acusado, pero invade un campo de especulaciones e inferencias no sostenido por la evidencia y que puede guiar erróneamente al jurado. El dejar el fiscal de llamar testigos que figuran en la acusación cuando los mismos están en el edificio de la Corte, fueron juramentados y pueden ser utilizados por el acusado, no constituye una supresión voluntaria de prueba. Nada impide que el acusado los utilice en su descargo. El Fiscal puede suprimir prueba acumulativa o corroborativa de hechos ya probados, y el acusado tiene oportunidad de llamar y examinar los testigos del pueblo en su descargo. Los testigos que cita el acusado, estaban en la corte y pudieron ser llamados por él."

No comprendemos en verdad cómo la corte que dió al jurado tan amplia instrucción sobre legítima defensa, se negó a trasmitirle la que el acusado dos veces solicitó sobre homicidio voluntario.

Homicidio es dar muerte ilegal a un ser humano sin que medie malicia, siendo voluntario cuando ocurre con ocasión de una súbita pendencia o arrebato de cólera. .(Artículo 203 del Código Penal.) ¿Y qué otra cosa que una súbita pendencia es la que describe el acusado como que tuvo lugar cuando de nuevo se encontró con el interfecto y se vió según él obligado a usar de su mocho para defenderse?

No importa lo increíble que pueda parecer determinada evidencia al juez que dirige la celebración de un juicio por jurado. No es a él sino al jurado al que corresponde decidir sobre el crédito que deba darse a los testigos. No es posible sostener en este caso la falta de existencia de prueba que sostenga una instrucción sobre homicidio, y el negarse a darla bajo esas circunstancias, constituye un error perjudicial. *Pueblo* v. *Crespo,* 21 D.P.R. 300; *Pueblo* v. *Rodríguez,* 35 D.P.R. 431.

Resumiendo jurisprudencia sobre el particular, dice Corpus Juris:

"Una instrucción de homicidio debe ser dada cuando hay evidencia tendente a establecer que el homicidio es de tal grado. Esto es así aunque la defensa sea o la prueba tienda a demostrar defensa propia, y aunque la teoría de homicidio sea planteada por la sola declaración del acusado; pero no es necesario que el testimonio de éste sea el que plantee la cuestión de homicidio, y cuando tal cuestión está claramente envuelta, es un error fatal para la corte el dejar de dar o el negarse a dar tal instrucción. Cuando haya una duda razonable en cuanto a una instrucción de homicidio, la duda debe ser resuelta en favor del acusado." 30 C. J. 406.

"Cuando tanto homicidio como defensa propia están en controversia y sostenidos por la prueba, deben darse instrucciones sobre ambos. Aunque se alegue defensa propia o se demuestre por la prueba, una instrucción de homicidio debe ser dada; y la corte debe también instruir al jurado que si se establece la defensa propia ella hace excusable el acto de dar muerte y el acusado debe ser absuelto. Pero las instrucciones relativas a la ley de homicidio voluntario y a la de homicidio justificable deben ser independientes entre sí, y trasmitidas en forma tal que el jurado se dé cuenta de dónde termina una y dónde comienza la otra, y estar en condiciones de trazar una línea divisoria de acuerdo con los hechos ante sí. Una instrucción de defensa propia no debe ser mezclada o dada en armonía íntima con una de homicidio especialmente cuando se ha dado otra instrucción sobre la primera." 30 C. J. 418.

Y el error toma mayores proporciones cuando se considera que estaba además envuelta en el caso la existencia o no existencia del arrebato de cólera.

Es cierto en cuanto a este extremo que a primera vista parece inconsistente sostener al propio tiempo la teoría de la súbita pendencia ocurrida cuando el acusado según su declaración sale de su casa a comprar cigarrillos y azúcar y se encuentra de nuevo con el interfecto, y el arrebato de cólera.

Sin embargo, creemos que en un caso de esta naturaleza la práctica más justa es la de someter la cuestión al jurado con las debidas instrucciones, para que sea él el que juzgándolo todo, rinda el veredicto que proceda. La experiencia demuestra que en casos como éste los jurados, hombres generalmente conocedores del corazón humano, suelen rendir admirables veredictos.

Quizá el jurado después de recibidas instrucciones sobre homicidio, hubiera rendido el mismo veredicto que rindió de asesinato. Tal vez hubiera declarado culpable de homicidio al acusado descartando la súbita pendencia y la defensa propia como algo fabricado luego, estimando que el acusado había actuado bajo la perturbación producídale por las ofensas que el interfecto poco antes le infiriera.

Era el jurado el llamado a dar crédito o no a las declaraciones del acusado y sus hijos. Pudo creerlas íntegras y llegar a concluir que las ofensas fueron extraordinariamente graves, capaces de producir una honda perturbación en el ánimo del acusado, e inclinarse a la teoría del homicidio, echando a un lado la súbita pendencia. Y pudo estimar como algo preparado luego, sin realidad, la ofensa inferida a la hija, y concluir que el acusado, colmada la medida de las imposiciones por parte del interfecto, decidió matarlo y en efecto lo esperó cerca de su casa y sigilosamente se le acercó y le asestó el tremendo machetazo que acabó con su vida, e inclinarse a la teoría del asesinato.

"Para que una persona acusada de asesinato," dice Ruling Case Law, resumiendo jurisprudencia, "caiga dentro de la definición del delito menor de homicidio voluntario, es necesario que demuestre que en el momento mismo en que

produjo la muerte estaba influído por la pasión inducida por el interfecto. La pasión debe haber continuado hasta el momento en que se cometió el acto homicida; si de cualesquiera circunstancias se desprende que el acusado meditó, deliberó o recapacitó durante algún tiempo antes de dar el golpe mortal, o si de acuerdo con la presunción legal hubo algún período de tiempo u oportunidad para recapacitar, la muerte equivaldrá a un asesinato, pudiendo atribuirse a malicia y deseo de venganza, y no a un disturbio mental. Qué constituye *'cooling time'*, como de ordinario se le conoce, depende de la naturaleza del hombre y de las leyes de la mente humana, así como de la naturaleza y circunstancias de la provocación, el extremo a que llegaron las pasiones y el carácter del acto que causó la provocación, y por tanto la corte no puede establecer como regla de derecho un momento preciso dentro del cual han cedido las pasiones, y la razón para reanudar su dominio. La cuestión es una de tiempo razonable, y depende de todas las circunstancias del caso específico; y la ley no ha definido ni puede definir sin cometer una injusticia crasa el período de tiempo preciso que ha de considerarse como razonable, según lo ha hecho respecto al aviso de que no se hace honor a un documento mercantil. Qué constituye un tiempo razonable en determinado caso es de ordinario una cuestión de hecho a ser determinada por el jurado; y la corte no puede privar de ella al jurado asumiendo que decide una cuestión de derecho. Sin embargo, algunas cortes han resuelto que cuando se desprende que ha transcurrido un período irrazonable de tiempo entre la provocación y la muerte, la corte está autorizada para decir como cuestión de derecho que el *'cooling time'* fué suficiente. Según algunas decisiones, la cuestión única no es si la pasión del acusado realmente se calmó, sino también si transcurrió suficiente tiempo para que la pasión de un hombre razonable pudiera apaciguarse. Si en realidad la pasión del acusado cedió, y ello puede demostrarse por medio de las circunstancias, como por ejemplo haber atendido a otros asuntos

en el ínterin, haber sostenido conversaciones racionales sobre otras materias, prueba de haberse preparado para la muerte, etc., entonces el tiempo que medió carece de importancia. Mas si en verdad tal pasión no cedió y entre la provocación y la muerte transcurrió un período de tiempo tal que la pasión del hombre promedio hubiera cedido y su razón hubiera reanudado su curso normal, entonces no se rebaja el delito a homicidio. No obstante, otras cortes sostienen que el jurado debe regirse, no por la regla de un tipo ideal, es decir, no por el hombre razonable, sino que debe considerar la cuestión desde el punto de vista del acusado ante todos los hechos y circunstancias.'' 13 R.C.L. 790.

Inspirándose en la anterior jurisprudencia (continúese estudiando la resumida en 13 R.C.L. 785 a 797), pudo y debió la corte de distrito someter la cuestión suscitada al jurado con las debidas instrucciones para guiarlo en su resolución.

En cuanto al error sobre prueba voluntariamente suprimida, a nuestro juicio la resolución de la corte, bajo las circunstancias concurrentes, fué correcta.

El nuevo juicio, debió en tal virtud concederse, por la falta de las debidas instrucciones sobre homicidio voluntario, siendo en su consecuencia improcedente que se dictara sentencia condenando al acusado.

*Debe revocarse la sentencia recurrida y ordenarse la celebración de un nuevo juicio.*

El Juez Asociado Señor Córdova Dávila no intervino.