El Pueblo de Puerto Rico, demandante y apelado, *v.* Félix Calderón Parrilla, acusado y apelante.

Núm. 5906.—*Sometido:* Junio 12, 1936. *Resuelto:* Julio 8, 1936.

*Félix Ochoteco, Jr.* y *Francisco Vizcarrondo*, abogados del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar*, abogados de El Pueblo, apelado.

El Juez Asociado Señor Travieso, emitió la opinión del tribunal.

La acusación formulada contra el acusado apelante, por el delito de asesinato genérico, lee así:

"…. El referido acusado Félix Calderón Parrilla, en época anterior a la presentación de esta acusación, o sea allá por el día 20 de marzo de 1934, y en Carolina, P. R., que forma parte del Distrito Judicial de San Juan, P. R., allí y entonces, de una manera ilegal y voluntaria, con malicia premeditada y expresa y firme y deliberado propósito de matar y demostrando tener un corazón pervertido y maligno, dió muerte ilegal al ser humano Justo Maldonado Guzmán, al cual le acometió y agredió con un revólver, que es un arma mortífera, infiriéndole varias heridas de bala, de carácter grave, y a consecuencia de dichas heridas de bala recibidas, falleció el mencionado Justo Maldonado Guzmán, el día 20 de marzo de 1934, en Carolina, y que tales heridas fueron inferidas por el acusado Félix Calderón Parrilla al hoy interfecto Justo Maldonado Guzmán, con la intención de matarlo."

Vista la causa, el jurado rindió su veredicto declarando al acusado culpable de asesinato en segundo grado. Presentada

moción para la concesión de un nuevo juicio, fué declarada sin lugar, y posteriormente la corte dictó sentencia imponiendo al acusado la pena de 16 años de presidio. Contra esa sentencia se ha interpuesto el presente recurso.

Se alega como un error fundamental de la corte inferior el haberse negado a dar al jurado las siguientes instrucciones solicitadas por la defensa:

"1.—Homicidio voluntario es privar de la vida a un ser humano en una súbita pendencia, o arrebato de cólera.

"2.—Si ustedes, caballeros del Jurado, tienen duda razonable a si el acusado cometió asesinato u homicidio voluntario, debéis de rendir un veredicto de homicidio voluntario.

"3. Si tenéis duda a si hubo o no hubo arrebato de cólera, tal duda debe de resolverse a favor del acusado, y por tanto, a favor de la existencia de tal arrebato de cólera.

"4.—El arrebato de cólera es un estado de ánimo a ser determinado únicamente por ustedes, caballeros del Jurado.

"5.—Señores, si ustedes tienen duda a si el acusado cometió asesinato en segundo grado, u homicidio, debéis declarar al acusado culpable de homicidio, ya que si tenéis duda de que el acusado cometió o no asesinato, deben declararlo culpable de homicidio."

Las instrucciones fueron denegadas por el motivo de que la corte entendía que no había prueba que justificara una instrucción sobre el delito de homicidio voluntario.

Las dos cuestiones que debemos considerar en el presente recurso pueden formularse así:

1ª. ¿Cuándo y bajo qué circunstancias puede la corte, en un caso de asesinato, negarse a dar instrucciones sobre los elementos constitutivos del delito de homicidio voluntario?

2ª. ¿Hubo en el caso de autos tal carencia de prueba sobre los elementos del homicidio, que justificara la resolución denegatoria de las instrucciones propuestas por la defensa?

■ En el caso de *Mow* v. *People,* 31 Colo. 351, 72 Pac. 1069, como en el caso de autos, la corte inferior no dió ins-

trucción alguna al jurado acerca del delito de homicidio voluntario. Al confirmar la sentencia por asesinato en segundo grado, la corte dijo:

"El próximo punto que consideraremos es la contención del abogado de los apelantes de que la corte erró al instruir al jurado que su veredicto debería ser o bien de culpable de asesinato de primer o de segundo grado o de no culpable. La objeción específica que se alega es que en las instrucciones se dejó fuera de consideración una instrucción con respecto al delito de homicidio voluntário. Existen dos razones por las cuales esta objeción no está bien fundamentada. En primer lugar, no hay una partícula de testimonio que hubiera justificado al jurado para declarar a los acusados culpables de homicidio, en uno u otro grado .... El juez que presidió la vista no estaba obligado a instruir al jurado sobre una cuestión no envuelta en el caso."

En *Demato* v. *People,* 49 Colo. 147, Am. Ann. Cases, 1912A, p. 783, se resolvió:

"Está bien sentado que cuando en un proceso por asesinato no hay evidencia por la que un jurado estuviese justificado en declarar al acusado culpable de homicidio voluntario, el juez sentenciador no está obligado a dar instrucciones sobre ese delito."

En *Crawford* v. *People,* 12 Colo. 290, 20 Pac. 769, la corte revocó la sentencia por asesinato, por haberse negado el juez sentenciador a dar instrucciones sobre homicidio voluntario, diciendo:

"Existe algún conflicto en las opiniones judiciales con referencia al deber de la corte de instruir al jurado acerca de los diferentes grados de homicidio. Ciertas autoridades parecen sostener que en tales casos la ley relativa a todos los grados incluídos en la acusación debe ser dada, sin tener en cuenta la evidencia ante el jurado. Pero un cuidadoso estudio de la materia nos lleva a la conclusión de que la siguiente regla está sostenida por una gran preponderancia de autoridades: Cuando existe alguna evidencia cualquiera que tienda a establecer un determinado grado estatutario de homicidio criminal, y la corte rehusa instruir al jurado con respecto a ese particular, se comete un error; pero, si hay una carencia total de evidencia relativa al grado del delito que no fué tomado en consideración, las instrucciones no pueden ser impugnadas con éxito por causa de tal omisión. (Numerosas citas.)

"Pero cuando ha habido una reyerta, y cuando se ha alegado la defensa propia, la corte ejercita una prerrogativa excesivamente peligrosa al negarse a dar instrucciones sobre los delitos inferiores, al igual que sobre los más graves, comprendidos en la acusación. El juez debería estar absolutamente seguro de que existe una carencia absoluta de evidencia relativa al grado o grados del delito que han sido omitidos.

"La negativa de la corte inferior a no instruir al jurado en este caso sobre el homicidio voluntario, fué un error. De acuerdo con el estatuto, al acusado en un; caso criminal se le permite declarar como testigo, y tan pronto como ocupa la silla testifical todas las reglas ordinarias de evidencia le son aplicables. Puede ser sometido a repreguntas, su declaración puede ser impugnada, las circunstancias bajo las cuales declara pueden ser consideradas, y el perjurio que pudiere cometer puede ser descubierto con igual facilidad que en el caso de otros testigos. El jurado ha de darle a su testimonio el crédito y el peso que en su opinión, y bajo todas las circunstancias, merezca. Puede el jurado aceptarlo como verdadero o rechazarlo como falso. Pero, por increíble, o falto de razón que parezca tal testimonio, el acusado tiene derecho a una instrucción sobre la hipótesis de que pueda ser cierto. People v. Keefer, 65 Cal. 232; State v. Banks, 73 Mo. 592."

Y en el mismo caso que acabamos de citar, la corte, después de hacer un resumen de la declaración del acusado en su propia defensa, dijo:

"Concurrieron circunstancias tendientes a provocar un súbito arrebato de cólera. Si esas circunstancias equivalían a la *provocación* estatutaria, o provocaron la cólera que el estatuto califica como *irresistible,* no era cuestión para ser resuelta por la corte. El testimonio del acusado demuestra la existencia de una cólera violenta, y, si hubiera sido aceptado como cierto, podría haber inducido al jurado a dictar un veredicto de homicidio voluntario.

"No decimos que ése debiera haber sido el veredicto o que el jurado hubiera dado otro distinto si hubiese sido debidamente instruído. Lo que decimos es que no había una carencia absoluta de prueba tendiente a establecer el delito de homicidio voluntario, y que el acusado tenía derecho a una instrucción con referencia a ese delito. Es claramente imposible para nosotros sostener que el error así cometido no ha sido perjudical."

Véanse: 13 Cal. Jur. 612, párr. 1; 13 R.C.L. 787, 791, 792; *Jones* v. *State,* 26 S. W. 1082; *Johnson* v. *State,* 5 L.R.A. (N. S.) 809 y nota; *Lewis* v. *State,* 231 S. W. 113.

La Corte Suprema Federal ha tenido ante sí esta misma cuestión en los casos de *Sparf & Hansen* v. *United States,* 156 U. S. 51, y *Stevenson* v. *United States,* 162 U. S. 313, 40 L. Ed. 981. Al revocar la sentencia en el último caso citado, por el motivo de haberse denegado una instrucción al jurado sobre el delito de homicidio, dijo la corte:

"La cuestión es si la corte erró al denegar la instrucción pedida. No es necesario que la evidencia en cuanto al homicidio sea incontrovertida o concluyente sobre esa cuestión; mientras haya alguna evidencia sobre la materia, es al jurado a quien corresponde determinar el peso de esa prueba. Si había alguna evidencia que tendía a demostrar la existencia de hechos que pueden traer el delito dentro del grado de homicidio, entonces era al jurado a quien incumbía decir si la evidencia era cierta y si probaba que el delito era homicidio en vez de asesinato .... La evidencia podría aparecer ante la corte como simplemente abrumadora para probar que la muerte fué en realidad un asesinato y no un homicidio voluntario o un acto realizado en defensa propia, y sin embargo, mientras haya alguna evidencia pertinente a la cuestión de homicidio, la credibilidad y fuerza de esa evidencia debe ser para el jurado y no puede ser decidida por la corte como una cuestión de derecho."

Esta Corte Suprema ha dado cuidadoso estudio a esta misma cuestión en varios casos que examinaremos brevemente.

En *Pueblo* v. *Crespo,* 21 D.P.R. 308, se dijo:

"Es verdad, como dice el fiscal en varias partes de su alegato, que el acusado no pidió instrucciones específicas para el jurado, pero esta Corte siguiendo el Código de Enjuiciamiento Criminal nunca ha dudado en examinar las instrucciones al jurado para ver si se ha cometido algún error sustancial. Opinamos que existe el error fundamental en no dar instrucciones con respecto al asesinato en segundo grado y al homicidio .... Bajo cualquier aspecto del caso, teniendo en cuenta las circunstancias particulares en que ocurrió la muerte el acusado tenía derecho a que se instruyera al jurado con respecto a los grados inferiores."

Véase también: *El Pueblo* v. *Roldán,* 27 D.P.R. 789.

En *Pueblo* v. *Rodríguez Dapena,* 35 D.P.R. 431, la única prueba importante fué la confesión escrita del acusado, relatando cómo había dado muerte a su esposa y al amante de ésta y describiendo la riña entre él y el amante antes de que el acusado hiciera los disparos. Al revocar la sentencia, esta corte dijo:

"Dados los hechos, era de la incumbencia del jurado el decir si la muerte ilegal tuvo lugar en una súbita pendencia o arrebato de cólera. A pesar del hecho de que el acusado vino armado y muy enfurecido a la casa de su esposa, correspondía al jurado resolver si la muerte fué producida por un arrebato de cólera. El dejar de instruir al jurado acerca del homicidio fué un error y el fiscal está conforme con esta conclusión."

También se revocó por igual motivo la sentencia de asesinato en segundo grado en el caso de *El Pueblo* v. *Fernández,* 49 D.P.R. 586, diciendo:

"No importa lo increíble que pueda parecer determinada evidencia al juez que dirige la celebración de un juicio por jurado. No es a él sino al jurado al que corresponde decidir sobre el crédito que deba darse a los testigos. No es posible sostener en este caso la falta de existencia de prueba que sostenga una instrucción sobre homicidio, y el negarse a darla bajo esas circunstancias, constituye un error perjudicial."

Veamos ahora si en el caso de autos se apartó la corte sentenciadora de la regla establecida por la jurisprudencia que hemos citado.

Hemos hecho un cuidadoso estudio de la evidencia presentada por el fiscal y por la defensa. De toda ella resultan como hechos indiscutibles los siguientes:

El acusado y el interfecto trabajaban como listeros en una colonia de cañas de la Loíza Sugar Company. Ambos eran amigos. El acusado era superior, en categoría y sueldo, al interfecto.

Con motivo de haber sufrido el acusado una operación quirúrgica en sus órganos genitales, el interfecto en varias ocasiones dió bromas al acusado, diciéndole en presencia de

otras personas que él, el acusado, era un "mariquita", un "maricón" y un "capao". El acusado en todas esas ocasiones protestó en forma correcta de las bromas de su amigo, llamándole a éste la atención y rogándole que se abstuviese de desacreditarle en esa forma. En ninguna de las ocasiones en que el interfecto hizo tales imputaciones al acusado en presencia de otras personas, trató el acusado de rechazar la ofensa agrediendo a su detractor.

El día 20 de marzo de 1934, como a las 3:30 de la tarde, en momentos en que el acusado y el interfecto se encontraban solos en la pequeña oficina donde acostumbraban trabajar juntos, surgió una discusión entre ambos con motivo de haberse negado el occiso a obedecer ciertas órdenes del acusado. Declara éste, que él volvió a suplicarle al interfecto que se abstuviera de provocarle diciéndole esas palabras ofensivas; que entonces el interfecto volvió a repetirle las mismas frases injuriosas, y que al oírlas el acusado perdió la paciencia, cogió el revólver que estaba en una tablilla y le disparó sin darse cuenta de lo que hacía. El acusado ha admitido que hizo los dos disparos mientras el interfecto estaba trabajando sentado en su escritorio, de espaldas hacia él, sin poder verle cuando se acercaba revólver en mano; y que le disparó a una distancia de un pie y medio a dos pies. Inmediatamente después del suceso, el acusado voluntariamente confesó a varias personas que acudieron al sitio que él era el que había dado muerte a Justo Maldonado, diciéndoles: "Lo hice porque me traía molesto; tuve que hacerlo porque me traía molesto."

Y al ser interrogado por el testigo Carlos Bird, tenedor de libros de la Loíza Sugar Company, sobre los móviles del crimen, el acusado le dijo que el interfecto venía molestándolo mucho diciendo cosas impropias que afectaban su honradez como hombre. Al replicarle Bird que ése no era motivo para matar a un hombre en la forma en que lo había hecho, el acusado contestó que tenía motivos muy poderosos y lo había hecho bajo esa impresión, que no podía permitir que ningún

hombre le dijera esas cosas; y al preguntarle Bird que cómo había realizado el crimen, el acusado le dijo que se levantó de su asiento y fué en puntillas y lo mató, disparándole por la espalda. Declaró además el testigo Bird que el acusado le dijo que la noche anterior al día del suceso, el interfecto le había increpado con palabras deshonestas para su honradez y que a él naturalmente le molestaron, y que pensó en matarlo pero que no tenía valor para hacerlo en esos momentos; que le daba pena porque lo apreciaba y no quería pelearle de frente; que mientras estuvo como compañero en la oficina él no pudo hacer nada, que esperó que saliera el personal.

Todos los testigos están contestes en el hecho de que al llegar al sitio encontraron el cadáver de Maldonado sentado frente a su mesa de trabajo, con el lápiz en la mano y la cabeza reclinada sobre la lista de pago en que trabajaba en el momento de ser sorprendido por la muerte.

La declaración del acusado en cuanto a las repetidas provocaciones que le hiciera el interfecto y en cuanto a la discusión acalorada ocurrida entre el interfecto y el acusado momentos antes del suceso, ha sido corroborada por las declaraciones de varios testigos.

El informe médico revela que el cadáver presentaba dos heridas de bala, ambas en la región posterior cervical, una a la derecha y otra a la izquierda, teniendo esta última orificio de salida en la región sigomática. Ambas heridas eran mortales por necesidad.

Arguye el Ministerio Público que la corte inferior procedió correctamente al negarse a dar instrucciones sobre el homicidio voluntario, por no existir pruebas que justifiquen tales instrucciones; que las propias frases del acusado "tuve que hacerlo porque me traía molesto", no solamente no prueban el arrebato de cólera, sino que constituyen una prueba más del asesinato; que la situación de ánimo del acusado al realizar la muerte no era otra que una de venganza, de rencor, de ensañamiento; que ese estado de ánimo no fué obra del momento, sino que venía preparándose desde antes,

buscando la oportunidad para saciar el rencor; que la declaración del perito médico y del testigo Carlos Bird, revelan que los disparos fueron hechos por la espalda, yendo el acusado en puntillas hasta colocarse a una distancia de dos pies de su víctima, por la espalda, sin que la víctima tuviese oportunidad de enterarse del ataque o de defenderse.

Aceptamos como sólida y bien fundada la argumentación del Ministerio Público. Considerada cuidadosamente la prueba de la defensa, no se desprende de ella la existencia del arrebato de cólera que la ley considera suficiente para disminuir la gravedad del delito. La forma y manera en que, según la propia confesión del acusado se cometió el delito, esperando que saliesen de la oficina las demás personas que allí había, yendo sigilosamente a herir a su víctima por la espalda y haciéndole no uno sino dos disparos dirigidos desde muy corta distancia a la base del cráneo del occiso, son incompatibles con la existencia de aquel estado pasional del ánimo, que nubla el entendimiento e inhibe la razón.

La corte inferior estuvo justificada al denegar las instrucciones solicitadas por la defensa.

Es éste uno de esos casos, desgraciadamente frecuentes, en que la víctima labró su propia muerte y la desgracia de su agresor, por su insistencia en molestar y provocar a éste hasta el punto de obligarle a pensar y ejecutar, como único plan para asegurar su tranquilidad, la supresión del provocador. La ley no puede autorizar a nadie a hacerse justicia por su propia mano. Nuestras leyes proveen remedios adecuados, a los que pudo y debió recurrir el acusado para protegerse contra las provocaciones y calumnias de su víctima.

El apartado 4 del artículo 237 de nuetro Código Penal provee:

"4.—Ninguna provocación verbal será causa suficiente para dar lugar a un acometimiento y agresión, pero el uso de palabras ofensivas o injuriosas podrá alegarse como prueba para la disminución del castigo que apareje el delito."

Creemos que tomadas en consideración las circunstancias especiales de este caso, la pena de dieciséis años de presidio impuesta por la corte inferior resulta excesiva y que debe ser reducida a la pena de diez años de presidio con trabajos forzados, que es la pena mínima que autoriza la ley.

*Y con esa modificación, se confirma la sentencia apelada.*

El Juez Asociado Señor Córdova Dávila no intervino.