EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JULIO CRUZ DEL VALLE, acusado y apelante.

No. 5783.—*Sometido:* Diciembre 13, 1935. *Resuelto:* Febrero 28, 1936.

* NOTA: Véase el prefacio.

*Alfonso Lastra Charriez y Justo A. Casablanca,* abogados del apelante; *R. A. Gómez, Fiscal, y Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

El Fiscal de la Corte de Distrito de San Juan formuló acusación contra Julio Cruz del Valle imputándole la comisión de un delito de asesinato consistente en haber dado muerte con malicia premeditada al ser humano Rufino Bosque el 18 de febrero de 1934, en Santurce, San Juan, P. R.

Leídale la acusación alegó ser inocente y solicitó juicio por jurado. Celebrado el juicio, el jurado lo declaró culpable de asesinato en segundo grado en abril 24, 1934. Solicitó nuevo juicio. La corte negó su solicitud y dictó sentencia en junio 25, 1935, condenándolo a sufrir once años de presidio. Apeló y señala en su alegato dos errores cometidos por la corte al declarar sin lugar su moción de nuevo juicio y al negarse a trasmitir al jurado instrucciones sobre homicidio involuntario.

La prueba del Pueblo comenzó con la declaración del Doctor Arsenio Comas que practicó la autopsia al cadáver de Rufino Bosque encontrando una herida de bala con orificio de entrada y salida en un brazo y otra también de bala en el quinto espacio intercostal derecho que penetró la cavidad torácica pasando por la base del pulmón izquierdo alojándose en los tejidos blandos al nivel de la décima costilla, produciendo una hemorragia interna que ocasionó la muerte. Las heridas pudieron ser causadas por el mismo proyectil.

Seguidamente declararon los testigos presenciales Enrique Luis de Jesús, Angel de la Rosa, Eladio Meléndez, Arturo Méndez y Amalio Paredes.

El primero, un niño de once años, dijo en resumen, que acabado un bautismo y un baile que se celebraban en una casa de "la zona", lugar de Santurce, el dueño de la casa hablaba con Saturnino López sobre la gente que se metía en las fiestas sin ser convidada, cuando llegó el acusado "y dijo: 'Aquí no hay guapo, yo soy el chévere, el terror de la zona' y sacó el revólver y disparó cuatro tiros y vuelve y carga el revólver y se vino para el tablero . . . y disparaba para arriba y disparaba para los lados y en el último tiro cogió a Rufino Bosque . . . que estaba en la esquina de una verja en la calle." Habría allí como doscientas personas. La defensa le hizo varias repreguntas. A la siguiente: "¿No le tiraba a nadie?", contestó: "Tiraba a como cogiera."

Los otros testigos de la Rosa, Meléndez y Méndez declararon más o menos en el mismo sentido y el último, Paredes, manifestó que el diez y ocho de febrero de 1935 "había un bautismo y parece que hubo un sinsabor entre los que habían allí, entre dos de esos que habían allí en el bautismo pero pronto se terminó y se llevaron los del sinsabor; se llevaron uno para su casa y entonces llegó Julio Cruz y dijo: '¿Y qué es lo que pasa? Esto se va a acabar ya mismo' y ahí hizo cuatro disparos pero luego volvió y cargó y entonces anduvo por el tablón y descargó tres tiros más y en el último de los disparos cogió a Rufino." A la defensa contestó que Rufino Bosque era hombre bueno, amigo del acusado, que no había habido discusión con él. Que el acusado no tuvo discusión alguna allí. A su pregunta "¿Sabe si el tiro que mató a Rufino fué tirado de frente o de espalda?", respondió: "Se le salió así."

Contestó luego al fiscal que el acusado hizo siete disparos y la defensa dijo: "Señor Juez: El señor fiscal acepta que el testigo nuestro Talavera, declararía que este acusado era guardia de los trabajos de la rehabilitadora y en cuanto al resto de la teoría de la defensa hago prueba mía la prueba del fiscal, y someto el caso sin argumentación."

Luego solicitó de la corte que instruyera al Jurado "so-

bre Homicidio Involuntario, imprudencia temeraria, pruden-
cia y circunspección y cuanto más se refiera al delito de Ho-
micidio Involuntario incluyendo lo que constituye 'Sin la de-
bida prudencia o circunspección,' '' negándose la corte por
entender que la instrucción no estaba justificada por la prueba.

Sabemos cuál fué el veredicto del jurado. La moción de
nuevo juicio se fundó en:

''Que el jurado que intervino en este caso, . . . . al estudiar la
prueba para resolver sobre la culpabilidad o inocencia del acusado
entendió que el delito cometido era de Homicidio involuntario, pero
que creído como estaba de que no podía dar dicho veredicto y pen-
sando todos ellos que lo único que podían hacer era rendir el vere-
dicto que rindieron de asesinato en segundo grado, así lo hicieron,
perjudicando los derechos del acusado en este caso.''

Se acompañó una declaración jurada de tres jurados que
dice:

''Que el veredicto rendido de asesinato en segundo grado, lo di-
mos en la creencia de que no estábamos autorizados, o que estábamos
prohibidos por la ley, para dar ninguna otra clase de veredicto; pero
que, apreciando la prueba, todos los firmantes estuvimos conformes
en que la misma no constituía necesariamente un veredicto de asesi-
nato en segundo grado y sí de homicidio involuntario por la razón
y causa de que, el acusado disparaba al aire habiendo accidentalmente
muerto a Rufino Bosque sin propósito ni intención de matarlo. Tam-
bién declaramos que de haber creído que se podía dar un veredicto
de acuerdo con la prueba, lo hubiéramos rendido de homicidio invo-
luntario.''

Al declarar la moción sin lugar la corte sentenciadora se
expresó, en parte, como sigue:

''En el caso presente recordamos perfectamente que cuando los
jurados regresaron del salón de deliberaciones y rindieron su vere-
dicto, preguntamos repetidamente a los jurados si el veredicto ren-
dido era la expresión unánime de los doce caballeros del jurado y la
expresión particular de cada uno de ellos. Todos contestaron afir-
mativamente. No hubo objeción al veredicto. No se pidió que se
pasara lista al jurado para que éste individualmente expresara su ve-
redicto. Debemos presumir que la ley se cumplió. Pero yendo un
poco más al fondo de esta moción de nuevo juicio que estamos resol-

viendo, la regla en cuanto al veredicto de un jurado y a la facultad de la corte para no' perturbarlo, la encontramos ampliamente discutida en 27 R.C.L. 897 y 898. Es una razón de política pública por la cual un tribunal de justicia conserva la autoridad de un veredicto si está convencido de que en su obtención no medió el azar o sorpresa, o cualquiera otra causa que lo pueda invalidar. Los casos de People v. Holmes, 118 Cal. 444; People v. Kloss, 115 Cal. 577 y People v. Kromphold, 172 Cal. 512, van directamente al punto. Hay otro caso que estudia la extensión del auto de error *coram nobis*, existente en California, y que sostiene la teoría que antes exponemos fundada en altas razones de policía pública y de moral social. Solamente hacemos referencia al mismo. People v. Reid, 36 A.L.R. 1435. El *affidavit* de tres de los caballeros que constituyeron el jurado en el que exponen su punto personal de vista, no nos hace variar nuestro criterio ni ignorar la jurisprudencia.''

Creemos que la corte actuó derechamente bajo las circunstancias concurrentes al declarar sin lugar la moción de nuevo juicio. Esta Corte Suprema, por medio de su Juez Asociado Sr. Hutchison, en el caso de *El Pueblo* v. *Lebrón,* 47 D.P.R. 430, 431, se expresó así:

''Isidoro Lebrón fué convicto del delito de asesinato en segundo grado. Su moción de nuevo juicio, basada en los incisos 4 y 6 del artículo 303 del Código de Enjuiciamiento Criminal, fué declarada sin lugar.

''El inciso 4 de dicho Artículo dispone la concesión de un nuevo juicio 'cuando el veredicto se hubiere obtenido por suerte o cualquier otro medio que no fuere una expresión verdadera de la opinión de todos los miembros del jurado.' Unida a la moción de nuevo juicio estaba un *affidavit* de uno de los miembros del jurado al efecto de que en su creencia, opinión y criterio el acusado era culpable de homicidio voluntario, no de asesinato en segundo grado, pero que, contrario a su creencia, opinión y criterio, por falta de experiencia, se sumó a los otros jurados para rendir veredicto de asesinato en segundo grado. No fué la intención de la Legislatura mediante el inciso 4 permitir que un miembro del jurado, con un *affidavit* de esa índole, impugnara el propio veredicto a que había llegado en forma ordinaria por consentimiento unánime, sin coerción o influencia extraña. ·Tal veredicto es 'expresión verdadera de la opinión de todos los miembros del jurado', dentro del significado de ese inciso.''

No existe el primer error señalado. Tampoco el segundo.

██ Conocemos la prueba. Homicidio involuntario es dar muerte ilegal a un ser hermano sin que medie malicia, cuando la muerte ocurre al realizarse un acto ilegal que no constituyere delito grave, o al realizarse un acto legal que pudiere ocasionar muerte en forma ilegal, o sin la debida prudencia o circunspección. Artículo 203 del Código Penal.

Homicidio involuntario según lo define Wharton en su obra sobre Homicidio, 3ª. ed., párrafo 211, citado en *Tharp* v. *State*, 137 S. W. 1097, es la muerte accidental de un ser humano ocasionada al realizar algún acto ilegal no constitutivo de delito grave o al realizar de modo impropio algún acto legal.

La definición es substancialmente igual a la contenida en nuestro estatuto y aplicada a los hechos de este caso, no los comprende en verdad.

En todo delito deberá existir unión o simultaneidad entre el acto y la intención o negligencia. La intención se manifiesta por las circunstancias relacionadas con el delito, y el sano juicio y discreción del acusado, reputándose de sano juicio todos los que no sean idiotas, lunáticos o locos. Una intención maliciosa y criminal se presume por la manera y deliberación con que se intente o cometa un acto ilegal con el propósito de perjudicar a otro. Artículos 11 y 12 del Código Penal.

Aquí el acusado llegó al sitio donde acababan de celebrarse el bautizo y el baile cuando el disgusto que parece que ocurrió había pasado y sólo se hacían comentarios sobre el mismo. Todo estaba tranquilo. Nadie lo llamó. Ningún deber se demostró que tuviera que cumplir allí, y jactándose de ser el guapo, el chévere, el terror de la zona, comenzó a disparar su revólver, arma mortífera, a diestro y siniestro, viendo que estaba rodeado de personas.

No surge de sus actos una intención deliberada de matar a determinado ser humano, pero no es su caso el caso de una persona que altera la paz haciendo disparos al aire, sino el de una persona que dispara su arma mortífera de modo tal

que tiene que saber que puede herir y matar a los seres humanos que lo rodean y que eso no obstante, sin provocación, sin justificación alguna, continúa en la realización de su acto criminal hasta que cae mortalmente herido un ser humano.

Ni menos es el caso de una persona que realiza un acto legal, el de guiar un automóvil por ejemplo, sin la debida prudencia o circunspección, y ocasiona la muerte de un semejante.

A menos que la defensa hubiere demostrado que el acusado era un idiota, un lunático o un loco, y tal situación no sólo no se demostró si que ni siquiera se alegó, debe presumírsele de sano juicio y bajo esa presunción sólo cabe llegar a la conclusión de que dándose cuenta de las consecuencias de sus actos, voluntariamente los llevó a cabo y es responsable de la muerte maliciosa que causó.

En McClain "On Criminal Law" (vol. 1, sec. 323), citado en *People* v. *Suesser*, 142 Cal. 354, 366, se dice: "Al determinar la criminalidad del acto de matar es inmaterial si la intención fué la de matar la persona muerta o si la muerte de tal persona fué el resultado accidental o de otro modo no intencional de la intención de matar a otro—la criminalidad del acto será siempre la misma."

Es cierto que aquí como ya dejamos dicho no sólo no se demostró el propósito de matar al ser humano que resultó muerto, si que tampoco se demostró la intención de matar a otro determinado ser humano, pero habiéndose demostrado que al disparar el acusado en la forma en que lo hizo rodeado de seres humanos, sabía que podía causar como causó la muerte de uno de ellos, la intención de matar deliberada y maliciosa es evidente.

Siendo ello así, no estaba obligado el juez sentenciador a trasmitir la instrucción solicitada.

*Debe confirmarse la sentencia recurrida.*

El Juez Asociado Señor Hutchison disintió.*

El Juez Asociado Señor Córdova Dávila no intervino.

---

* Nota: Véase el prefacio.