EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* SATURNINO TORRES ECHEVARRÍA, acusado y apelante.

Número 15387.

*Sometido:* 5 de junio de 1953. *Resuelto:* 22 de julio de 1953.

*Ernesto Ramos Antonini,* abogado del apelante; *Hon. Secretario de Justicia José Trías Monge* y *Jaime García Blanco, Fiscal Especial, Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del tribunal.

En la noche del día 6 de abril de 1948, en el sitio denominado "El Canódromo", Parque Muñoz Rivera de San Juan, Puerto Rico, Saturnino Torres Echevarría dió muerte con una pistola al soldado norteamericano David H. Daniel e infirió tres heridas de carácter grave al ciudadano Luis Antonio Matos Espada. Con motivo de estos hechos, el referido Saturnino Torres Echevarría fué procesado ante el anterior Tribunal de Distrito de San Juan, por los delitos de Asesinato en Primer Grado, Atentado a la Vida, Portar Armas e Infracción a la Ley sobre Registro de Armas.

Los casos *felonies* se vieron conjuntamente ante un jurado y los *misdemeanors* fueron sometidos al juez que presidió la vista por la misma prueba ofrecida en los casos de Asesinato en Primer Grado y Atentado a la Vida.

El jurado rindió veredictos declarando al acusado culpable de Asesinato en Segundo Grado y de Atentado a la Vida. Por su parte el juez le declaró culpable de los delitos de Portar Armas e Infracción a la Ley sobre Registro de Armas. Luego de ser sentenciado en todos y cada uno de dichos casos apeló para ante este Tribunal,[1] imputando a la corte sentenciadora, la comisión de los siguientes errores:

---

[1] Aunque en los autos elevados a este Tribunal hay constancias de que el acusado apelante se encuentra en libertad bajo fianza prestada en cada uno de los casos en que fué sentenciado, no aparece de dichos

"Primer Error: La corte a quo erró al admitir en evidencia varias fotografías de la víctima en el caso de asesinato presentadas por el Fiscal con el propósito de impresionar al jurado.

"Segundo Error: El tribunal inferior erró al admitir en evidencia varias fotografías tomadas varios días después de los hechos simulando posiciones y al permitir que se le preguntara al testigo Matos Espada sobre las mismas sin ser admitidas en evidencia.

"Tercer Error: El Tribunal de Distrito (Superior) erró al permitirle al Fiscal hacerle preguntas al acusado, con la vigorosa oposición de la defensa, relacionadas con la declaración prestada por el acusado la noche de los hechos sin seguir las disposiciones de la Ley de Evidencia.

"Cuarto Error: La Corte a quo erró al permitirle al Fiscal hacer manifestaciones y referirse a evidencia no presentada y admitida en evidencia en el proceso.

"Quinto Error: El veredicto es contrario a la prueba y a derecho."

El primer error señalado no fué cometido. En el curso de su testimonio el perito médico doctor George D. Penick identificó varias fotografías del cadáver del soldado Daniel. Este médico fué el que practicó la autopsia en dicho cadáver. Al ser ofrecidas en evidencia las fotografías identificadas, el Tribunal, con la objeción de la defensa, admitió únicamente aquéllas que indicaban un orificio de entrada de una bala y ciertas erosiones en el cuerpo de Daniel. Alega el acusado que el fiscal no perseguía ningún propósito legítimo al ofrecer esas fotografías en evidencia y sí crear un prejuicio en la mente del jurado y que su admisión perjudicó fundamentalmente sus derechos. No tiene razón. Las fotografías eran admisibles en evidencia. El mero hecho de que pudieran impresionar al jurado en sentido desfavorable al acusado, no justifica su exclusión, siempre que se hayan ofrecido para un propósito legítimo de la acusación. *Pueblo* v. *Zayas Ortiz*, 65 D.P.R. 538; *Pueblo* v. *Rivera*, 69 D.P.R. 538, 541, y *Pueblo* v. *Galarza*, resuelto

autos que el acusado haya apelado de la sentencia impuéstale por el delito de Portar Armas.

*per curiam* en 29 de diciembre de 1951. Las admitidas por la corte a quo, mostraban el orificio de entrada del proyectil y las erosiones que presentaba el occiso en la cara. Ese era un fin legítimo de la acusación si se considera en relación con el resto de la prueba de una y otra parte. Basta recordar el interés demostrado por el jurado y por el propio acusado en fijar la altura del supuesto orificio dejado por el proyectil en la puerta del kiosko, altura del interfecto, etc., *People* v. *Lee Nam Chin*, 166 Cal. 570; *People* v. *Coleman*, 50 C.A.2d 592. Por otro lado, las fotografías admitidas no contienen exposiciones grotescas o impresionantes. A falta de razones en contrario, no comprendemos en qué forma dichas fotografías han podido lesionar los derechos fundamentales del acusado.

■ Tampoco se cometió el segundo error. Por este señalamiento se ataca la actuación de la corte a quo en admitir en evidencia varias fotografías del lugar donde ocurrieron los hechos. Algunas de estas fotografías representan la reproducción de escenas, tales como la posición en que el testigo Luis Antonio Matos Espada encontró el cuerpo del soldado Daniel, forma en que lo trasladó hasta el kiosko del acusado, posición en que lo dejó recostado del kiosko, etc. Cuando estas fotografías le fueron mostradas por el fiscal al testigo Luis Antonio Matos Espada para su identificación ya éste había declarado extensamente sobre los hechos ocurridos la noche del 6 de abril de 1948. Había descrito oralmente el lugar de los sucesos, así como su participación en los mismos, actuaciones suyas esa noche, sus movimientos, cosas que observó, etc. Dichas fotografías eran claramente admisibles tanto porque representaban el lugar de los hechos como porque servían para ilustrar el testimonio de Matos Espada. *Pueblo* v. *Márquez*, 67 D.P.R. 326; *People* v. *Perkins*, 8 C.2d 502; *People* v. *Grill*, 151 Cal. 592; *People* v. *Sliscovich*, 193 Cal. 544, 226 Pac. 611; *People* v. *Clapp*, 26 Cal. App. 523, 147 Pac. 469.

■■ El tercer error se refiere a un incidente surgido mientras el fiscal repreguntaba al acusado. Alega el apelante que el fiscal no siguió, a pesar de la vigorosa oposición de la defensa, las disposiciones de la Ley de Evidencia al tratar de impugnar la declaración del acusado. La pregunta objetada por la defensa fué la siguiente: "¿Mire a ver si me dijo algo distinto a lo que me dijo en la playa?" El juez entendió que la pregunta no estaba completa y entonces el fiscal la formuló así: "¿Mire a ver si me dijo algo en algún otro sitio del mundo distinto a lo que me dijo en la playa cuando se extrajo del mar esta pistola?" Se permitió la pregunta y el acusado contestó que le había declarado dos veces al fiscal, en el kiosko y sus alredededores y en el cuartel de la policía. Luego el fiscal insistió en una serie de preguntas para que el testigo le dijera si en algún otro sitio del mundo que no fuera la playa le había dicho que la pistola se le había caído en un pastizal y no sabía el sitio en que cayó. El testigo contestó que no recordaba.

Asumimos con el apelante que en esa línea de preguntas no se siguió estrictamente las disposiciones de la Ley de Evidencia. Si las manifestaciones anteriores fueron orales debieron especificarse las circunstancias de fecha, lugares y personas que se hallaban presentes. Artículo 245 del Código de Enjuiciamiento Criminal, ed. 1937, 159 de la Ley de Evidencia. Sin embargo, el error de haberse cometido, no conlleva la revocación de la sentencia. El apelante ha dejado de demostrarnos que se hayan lesionado sus derechos sustanciales y en ausencia de perjuicio no debemos alterar la sentencia apelada. *Pueblo* v. *De Jesús*, 70 D.P.R. 37; *Pueblo* v. *Rosario*, 68 D.P.R. 566. Por otro lado, el Fiscal finalmente mostró al abogado defensor y al acusado la declaración que este último prestara por escrito, y se le ofreció amplia oportunidad de negar o explicar cualquier contradicción o inconsistencia entre dicha declaración y su testimonio oral. Luego fué ofrecida y admitida en evidencia la declaración escrita del acusado, a los fines de impugnar su testimonio.

En términos generales se dió así cumplimiento a la ley. *Pueblo* v. *Lebrón*, 61 D.P.R. 657.

▮ Por el cuarto señalamiento se imputa a la corte a quo haber incurrido en error al permitirle al fiscal hacer manifestaciones y referirse en su informe a evidencia no presentada ni admitida durante el proceso. La defensa hizo constar en récord que mientras el fiscal informaba al jurado, señalando para su escritorio, dijo "tengo unas cuantas cosas ahí que hubiera presentado y que no presenté porque las reglas de evidencia no lo permiten. Tengo ahí unas cuantas cosas que yo hubiera presentado, que hubiera explicado y que yo no puedo presentar además porque hubiera tenido que sentarme como testigo y está censurado que un abogado se siente como testigo en el propio caso que lleve." Aparte de que al hacer tal comentario el fiscal refutaba el argumento usado por la defensa en relación con cierta prueba que tampoco fué presentada y admitida por la corte, y sobre la cual dijo el abogado defensor, "el fiscal no se sentó a negar que encontró el plomo y los casquillos en el kiosko. No me los quiso entregar", el juez subsanó cualquier posible error o perjuicio para el acusado, al dar inmediatamente las siguientes instrucciones al jurado:

"Señores del jurado, en estas interrupciones que se han hecho al orador, refiriéndome también a lo que se dijo en Corte antes de terminar el caso, en que el abogado del acusado solicitó del Fiscal que le suministrara dos casquillos; el Fiscal ofreció suministrárselos si le pedía toda la evidencia que tenía ahí, y en eso ninguno de los dos ofreció los casquillos y además refiriéndome a lo que dijo la defensa en su argumentación y a que se refiere el Fiscal ahora y lo que dijo el Fiscal ahora, los instruyo para que no tengan en cuenta nada que no sea evidencia admitida ante esta Corte. Cualquier cosa que tenga el Fiscal en ese paquete o en cualquier otro sitio que no haya sido presentada como prueba no tienen que tomarlo en cuenta, excepto que aquellos objetos y aquella prueba que haya podido presentar alguna parte y no haya sido presentada, pudiendo así hacerlo, se considera evidencia voluntariamente suprimida y así adversa a la parte que la suprime."

El apelante cita en apoyo de su contención el caso de *Pueblo* v. *Marchand Paz*, 53 D.P.R. 671. Los hechos de aquel caso son distinguibles de los de autos. Allí el jurado recibió de labios del fiscal algo que equivalía a evidencia inadmisible, cuya naturaleza perjudicial no podía ser subsanada por una instrucción del juez. En el presente caso, sin embargo, el fiscal no dijo en qué consistía la evidencia que había dejado de presentar y además la oportuna instrucción trasmitida por el juez al jurado, ponía a salvo los derechos del acusado, subsanando cualquier perjuicio que hubieran podido causar las palabras del fiscal, especialmente la instrucción sobre el efecto de evidencia voluntariamente suprimida. Véase *Pueblo* v. *Ojeda*, 66 D.P.R. 419; *Pueblo* v. *Zayas Ortiz*, supra; *Pueblo* v. *Montes*, 64 D.P.R. 321; *Pueblo* v. *Yera*, 60 D.P.R. 818.

Por el quinto señalamiento se impugnan los veredictos rendidos por el jurado, alegándose que los mismos son contrarios a derecho y a la prueba. Esto nos lleva a hacer un resumen de dicha prueba. La del Pueblo fué al efecto de que el acusado apelante poseía un pequeño kiosko en el sitio denominado "El Canódromo" en el Parque Muñoz Rivera de San Juan. Alrededor de las 11:30 de la noche del día 6 de abril de 1948, el apelante, haciendo uso de una pistola, hirió de bala a un soldado norteamericano de nombre David H. Daniel, causándole la muerte. Momentos después pasaba por aquel lugar Luis Antonio Matos Espada quien al descubrir el cadáver del soldado Daniel, le arrastró hasta el kiosko del acusado, donde le recostó en posición sentada. Al realizar esta operación Matos Espada tropezó con el kiosko. Entonces el acusado desde dentro del kiosko preguntó "¿Qué pasa ahí?," contestando Matos Espada "Es la policía". Salió el acusado del kiosko con una pistola en la mano y se dirigió hacia Matos Espada. Entonces éste le dijo que allí había un soldado herido y encendió un fósforo para que lo viera. Miró el acusado y luego se alejó por un momento regresando donde Matos Espada, a quien le dijo "vete

y no digas nada". Se fué Matos Espada y cuando había caminado una distancia de seis pies el acusado le hizo varios disparos con la pistola, produciéndole tres heridas de bala, a consecuencia de las cuales cayó al suelo. Luego de lanzar la pistola al mar el acusado se dirigió a la oficina de la Guardia del Parque Muñoz Rivera. Allí encontró al Jefe de dicha Guardia, Ramón A. Rivera. También estaba presente otro guardia. Dirigiéndose a Rivera el acusado dijo "Arrésteme y sálveme la vida que he matado a dos en mi kiosko." Fué detenido y cuando más tarde se presentó allí la detective, Rivera dijo a ésta en presencia del acusado, "Ése es el acusado del crimen", permaneciendo callado el apelante.

La prueba de descargo tendió a demostrar lo siguiente. El kiosko del acusado había sido escalado en varias ocasiones con anterioridad al día de los hechos. En vista de ello, el acusado, quien entonces residía en Villa Palmeras de Santurce, decidió irse a dormir en su kiosko. La noche de los sucesos se acostó a dormir como a las 10:00 P. M. Hora y media después despertó en los momentos en que sintió gente tratando de abrir la puerta del kiosko. Lleno de miedo y pánico cogió la pistola e hizo dos disparos hacia esa puerta. Entonces comenzó a vestirse y en esos momentos sintió piedras que dieron contra el zinc y la ventana del kiosko. Se le cayó la tranca a esta ventana y por ahí salió hacia el exterior del kiosko. En esos momentos un joven que estaba por allí le atacó con piedras. Disparó contra ese joven y éste cayó. Después de eso fué que se dió cuenta que frente a la puerta de entrada del kiosko había un hombre muerto. Tiró entonces la pistola al mar y fué a entregarse, encontrándose con dos guardias del Parque, uno de nombre Rosendo a quien le dijo que había hecho disparos desde dentro del kiosko a dos individuos que habían tratado de abrirle la puerta y había matado a uno de ellos. Para protegerlo, los guardias lo llevaron a su oficina y de allí el Fiscal y la Detec-

tive lo condujeron al cuartel de la policía en Puerta de Tierra.([2])

Arguye el acusado apelante que la prueba no demostró que él diera muerte al soldado Daniel con malicia y premeditación; que el acusado ni siquiera conocía a la víctima y no había tenido disgustos con él por lo que no es posible que existiera en el acusado la intención de darle muerte. No tiene razón. Hemos visto que por la muerte del soldado Daniel, el jurado declaró al acusado apelante culpable del delito de asesinato en segundo grado. En el caso de *Pueblo* v. *Méndez,* 74 D.P.R. 913, 926, dijimos.

"En síntesis, en cuanto a la modalidad que estamos discutiendo, el asesinato en primer grado incluye los elementos de deliberación y de intención específica de matar. En el asesinato en segundo grado, basta la malicia premeditada, sin la intención específica deliberada de matar, o sea, se refiere a la intención de realizar un acto que resulte en la muerte, pero en virtud del propósito de causar daños corporales que puedan probablemente resultar en la muerte, y así resulten, sin que el actor haya tenido el propósito directo, específico y deliberado de matar. Ya la jurisprudencia sentada por este Tribunal ha determinado que el asesinato en primer grado se caracteriza por la deliberación y la intención específica de matar, y no así en el segundo grado. *El Pueblo* v. *Lassalle,* 18 D.P.R. 421, 423; *Pueblo* v. *Carrión,* 35 D.P.R. 901; *Pueblo* v. *Garcés,* 29 D.P.R. 1029; *Pueblo* v. *Torres,* 34 D.P.R. 651; *El Pueblo* v. *Crespo,* 21 D.P.R. 300; *Pueblo* v. *Belardo,* 50 D.P.R. 512; *Pueblo* v. *Rosario,* 67 D.P.R. 371."

No hay controversia en cuanto a que la muerte del soldado Daniel fué el resultado y consecuencia de los disparos hechos por el acusado apelante. Éste así lo admitió. Por tanto, correspondía a dicho acusado probar las circunstancias atenuantes o que justifiquen o excusen el hecho de la muerte, a menos, desde luego, que éstas surjan de la prueba de cargo.

---

([2]) Al hacer el resumen de la prueba hemos omitido aquellos detalles que son innecesarios considerar a los fines de resolver el error planteado en el quinto señalamiento.

Artículo 247 del Código de Enjuiciamiento Criminal (ed. 1935); *Pueblo* v. *Rosado*, 17 D.P.R. 441; *Pueblo* v. *Ortiz,* 62 D.P.R. 258; *People* v. *Knapp*, 71 Cal. 1. En un proceso por asesinato el Pueblo no viene obligado a ofrecer prueba directa y específica de la malicia y premeditación, *People* v. *Mahatch*, 148 Cal. 200, 82 Pac. 779; *People* v. *Copley*, 32 C.A.2d 74, 89 P.2d 160, pudiendo éstas inferirse de la manera en que se usa un arma de fuego. *Pueblo* v. *Román*, 70 D.P.R. 50; *Pueblo* v. *Álamo*, 62 D.P.R. 126. Tampoco venía el fiscal obligado a probar el motivo del crimen, *People* v. *Aranda*, 83 P.2d 928, o la existencia de discrepancias, rencillas o enemistad entre el acusado y su víctima. *People* v. *Cornett*, 61 C.A.2d 98. Sin embargo, según expresa correctamente en su informe el Fiscal de esta Corte,

"En este caso, el propio acusado expone los motivos que le indujeron a realizar los actos constitutivos del delito. Las circunstancias que rodearon su actuación, su conducta y proceder, por otro lado, muestran la malicia y premeditación en el hecho homicida, ejecutado sin causa o excusa alguna, sin notable provocación y revelan en él un corazón pervertido y maligno. Preocupado y molesto por los alegados escalamientos de que había sido objeto su kiosko o negocio, armado de una pistola, se decide a dormir en el mismo y defender su propiedad. Despierta sobresaltado al sentir que 'trastean' la puerta de entrada y, diz que para 'amedrentar', para defender su propiedad, apunta y dispara hacia ella (T. E. pág. 232). Presa del temor, sin notable provocación, sin causa justificada alguna, sin considerar siquiera el peligro a que podía estar expuesto, apunta y dispara hacia la puerta de donde procedía el ruido que dice le había despertado.

"Del acto de disparar hacia aquella puerta—sabiendo que podía causar, como causó, la muerte de un ser humano—, puede y debe presumirse la malicia. *Pueblo* v. *Cruz*, 49 D.P.R. 653, 659. Al disparar contra aquella puerta, creyendo y temiendo que allí había un hombre, la muerte de éste no era un accidente y sí un acto culposo y premeditado. Toda persona intenta y es responsable de las consecuencias naturales de sus actos. *Pueblo* v. *Colón*, 65 D.P.R. 760, 766; *Stovall* v. *State*, 32 S.E. 586."

En el caso de *Pueblo* v. *Cruz*, 49 D.P.R. 653, dijimos a la página 659:

"Es cierto que aquí como ya dejamos dicho no sólo no se demostró el propósito de matar al ser humano que resultó muerto, si que tampoco se demostró la intención de matar a otro determinado ser humano, pero habiéndose demostrado que al disparar el acusado en la forma en que lo hizo rodeado de seres humanos, sabía que podía causar como causó la muerte de uno de ellos, la intención de matar deliberada y maliciosa es evidente."

En cambio, el caso citado por el apelante—*Pueblo* v. *Ayala*, 52 D.P.R. 722—no puede aplicarse a los hechos aquí envueltos. Dijimos en dicho caso:

"Cuando la muerte es el resultado de un mero accidente y no hubo la intención de herir a nadie, o de apuntar en la dirección en que se hallaba el occiso, una corte debe darle al jurado la oportunidad de declarar al acusado culpable de homicidio o quizá limitar el veredicto a ese delito."

Aquí no se trata de un mero accidente, ni puede negarse que hubo la intención de herir a alguien [a los supuestos escaladores] o que no hubo la intención de apuntar en la dirección que estos se hallaban.

Por otra parte, la prueba de defensa no demostró, en forma que obligara al jurado a así creerlo, que el soldado Daniel intentó cometer o iba a cometer un delito de escalamiento en el kiosko del acusado cuando éste hizo los disparos que le ocasionaron la muerte. En tales circunstancias, el jurado estuvo justificado en rendir un veredicto de asesinato en segundo grado y éste no es contrario a la prueba ni a derecho.

En cuanto al caso de atentado a la vida el acusado apelante se limita a decir que él actuó en defensa propia, de su vida y su propiedad. Tampoco tiene razón. La prueba creída por el jurado sostiene todo lo contrario. Por tanto, carece de méritos su contención.

■ El recurso interpuesto contra la sentencia impuesta al acusado apelante en el caso por portar armas, debe ser

desestimado. No habiéndose incorporado a la transcripción de los autos el escrito de apelación, carecemos de poder para resolver el recurso. *Pueblo* v. *Lorenzo*, 18 D.P.R. 978; *Pueblo* v. *Viñales*, 19 D.P.R. 112; *Pueblo* v. *Olivencia*, 20 D.P.R. 60.

▬ Finalmente consideraremos el recurso interpuesto contra la sentencia dictada en la causa seguida contra este acusado por infracción a la Ley sobre Registro de Armas. Es un hecho incontrovertible que el día 6 de abril de 1948 el acusado apelante tenía una pistola en su posesión y dominio sin haberla registrado de acuerdo con la referida ley. Dicha pistola fué ocupada y habiendo sido el acusado condenado por su portación ilegal, la misma será decomisada. En *Pueblo* v. *Tribunal de Distrito*, 70 D.P.R. 678, resolvimos que al enmendarse el artículo 7 de la Ley sobre Registro de Armas—Ley núm. 14 de 8 de julio de 1936 ( (2) pág. 129)— por la Ley núm. 44 de 27 de septiembre de 1949 ( (2) pág. 97), la Legislatura concedió una amnistía a todas aquellas personas que tenían en su posesión y dominio armas sin registrar en violación de la ley con el fin de que las registraran y que debían archivarse los casos pendientes, siempre que el acusado cumpliera con la obligación impuéstale por la ley de registrar el arma. Posteriormente dijimos en el caso de *El Pueblo* v. *Acevedo*, 70 D.P.R. 695, que en vista de la decisión emitida en el caso de *Pueblo* v. *Tribunal de Distrito*, supra, debía ordenarse el archivo y sobreseimiento de la causa seguida contra el acusado Acevedo por una infracción a la Ley sobre Registro de Armas cometida en 11 de noviembre de 1948, sin que fuera necesario que dicho acusado cumpliera previamente con la obligación de registrar el arma impuéstale por la ley, toda vez que habiendo sido él condenado por la portación ilegal del arma, la misma sería decomisada.

Sin embargo nuestra decisión en el caso de *Pueblo* v. *Tribunal de Distrito*, supra, no tiene el alcance que le dimos en el de *Acevedo*. Dijimos en aquel caso que concurrían allí

dos circunstancias que consideradas conjuntamente demostraban que el propósito legislativo al aprobar la Ley núm. 44 de 1949 fué que no continuasen las acciones pendientes; que una de dichas circunstancias era que este Tribunal en el caso de *Pueblo* v. *Pérez*, 52 D.P.R. 169, interpretando la Ley núm. 95 de 12 de marzo de 1937 (Leyes de 1936–37, pág. 240), por la cual fueron enmendados los artículos 7 y 9 de la Ley núm. 14 de 8 de julio de 1936 conocida como Ley de Registro de Armas, resolvió que la ley derogatoria —cuyos artículos 7 y 9 eran sustancialmente iguales a los 7 y 9 de la Ley núm. 44 de 1949—tenía el efecto de descontinuar las causas pendientes; que la otra circunstancia era que de las actas de la Cámara de Representantes de modo expreso aparece que el propósito de la Ley núm. 44 de 1949 fué eliminar las causas pendientes y dar a todo el que no hubiere cumplido con la ley amplia oportunidad de acatarla. El acta de la Cámara de Representantes, en lo pertinente, dice:

"En virtud de este proyecto se le da una nueva oportunidad a todas esas personas que tienen esas armas de fuego sin inscribir para que las inscriban sin que se les procese ni condene en ninguna forma por ello, *aunque haya una acción en contra de ellos,* y procederse a la inscripción de las armas sin más demora. Lo que se persigue con esta Ley es conseguir que todas las armas no inscritas, se inscriban, y para ello brinda esta nueva oportunidad a los infractores de la ley."

En consonancia con ese claro propósito fué que dijimos en el caso de *Pueblo* v. *Tribunal de Distrito*, supra, lo siguiente:

"No tenemos duda de que en el presente caso fué la intención de la Legislatura que se archivaran los casos pendientes siempre que, previamente, el acusado cumpla con la obligación impuéstale por la ley de registrar el arma. El acusado tiene derecho a esa oportunidad."

Condicionamos pues, el archivo de los casos pendientes al previo cumplimiento por el acusado de la obligación impuéstale por la ley de registrar el arma.

En este caso el acusado no está en condiciones de dar cumplimiento previo a esa obligación impuéstale por la ley, como tampoco lo estaba el acusado en el caso de Acevedo. La razón es obvia. El acusado fué procesado y convicto por la portación ilegal de dicha arma y como consecuencia la misma ha sido decomisada. No se logra pues el propósito legislativo descontinuando la causa contra este acusado por infracción a la Ley sobre Registro de Armas. El archivo de la causa procede sólo en aquellos casos en que el acusado ha sido procesado únicamente por infringir la Ley sobre Registro de Armas. En esa forma se le brinda una oportunidad de cumplir con la ley. El acusado en este caso no cae dentro de esa regla. Por lo tanto la sentencia impuéstale debe ser confirmada y el caso de *Pueblo* v. *Acevedo*, supra, en tanto en cuanto está en conflicto con lo aquí resuelto se considerará revocado.

*Por todo lo expuesto se confirman las sentencias impuestas al acusado en los casos de Asesinato en Segundo Grado, Atentado a la Vida e Infracción a la Ley Sobre Registro de Armas y se desestima el recurso en el caso de Portar Armas.*