EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CECILIO CORTÉS DEL CASTILLO, acusado y apelante.

Número 16075.

*Sometido*: 14 de noviembre de 1956. *Resuelto*: 6 de marzo de 1957.

*Manuel A. García Méndez* y *F. Fonsa Feliú,* abogados del apelante; *Hon. Secretario de Justicia José Trías Monge* y *Arturo Estrella, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

El Juez Asociado Señor Pérez Pimentel emitió la opinión del Tribunal.

Cecilio Cortés del Castillo fué acusado ante el Tribunal Superior, Sala de Aguadilla, de un delito de asesinato en primer grado, consistente en que dicho acusado "allá en o por el día 19 de mayo de 1954, y en Isabela, Puerto Rico, ... ilegal y voluntariamente, con malicia, premeditación y deliberación y con propósito firme y decidido de darle muerte ilegal, demostrando tener un corazón pervertido y maligno, acometió y agredió con un revólver, que es un arma mortífera, a su hija Gladys Estela Cortés Vélez, que es un ser humano, infiriéndole una herida de bala de carácter grave, que fué la causa y ocasionó la muerte de la citada Gladys Estela Cortés Vélez, el mismo día 19 de mayo de 1954."

También se le acusó de una infracción al art. 6 de la Ley de Armas de Puerto Rico. Un jurado declaró al acusado culpable del delito de Asesinato en Segundo Grado, y luego de declarar sin lugar una moción de nuevo juicio, el Juez que presidió el juicio le sentenció a cumplir de quince (15) a treinta (30) años de presidio. El acusado fué también convicto por tribunal de derecho de la infracción a la Ley de Armas imputádale y sentenciado a cumplir de dos (2) a cinco (5) años de presidio concurrentemente con la sentencia dictada en el caso de asesinato.

El acusado apeló de ambas sentencias, así como de la resolución denegándole un nuevo juicio y en su alegato señala la comisión de diez errores. Para mayor claridad en la discusión de estos errores, conviene hacer antes, aunque sea a grandes rasgos, un resumen de la prueba.

La de cargo tendió a probar que como a las seis y media de la tarde del día 19 de mayo de 1954, mientras el joven

Erasmo Gutiérrez Gutiérrez se encontraba sentado en un muro de concreto que hay en el sitio conocido como la Parada Siete del Cartero en el barrio Guayabo de Isabela, conversando con Celestino Valentín de la Cruz sobre cierto negocio que iban a hacer con una guitarra, Erasmo vió que Gladys Cortés venía del almacén de su padre Cecilio Cortés del Castillo "asustada, temblando y nerviosa", sujetándose con su mano izquierda la falda que vestía. Luego de hablar con Erasmo, Gladys se dirigió a la casita donde ocurrieron los hechos que relataremos más adelante. Erasmo se dirigió entonces a su hogar a buscar una guitarra y cuando regresaba con ella, Gladys, que en esos momentos se encontraba parada en la puerta de entrada de la casita sujetándose la falda con su mano izquierda y con la otra se sujetaba de la puerta, le llamó. Erasmo se detuvo a la orilla de la carretera y ella le dijo que no dejara de traerle los retratos; que le dijera a Juan Ramón Saavedra (quien era su novio) que se los mandara. Erasmo le preguntó que por qué le decía eso, que qué le pasaba a ella, a lo que contestó: "Ay, ese viejo de casa que no quiere que una se enamore; si será que él quiere las hijas para él abusar de ellas." En ese momento sonó un disparo, Gladys dió media vuelta y cayó herida sobre una acerita de concreto que hay frente a la casita. Al caer, dijo: "Tato, Tino; Tato, Tino, recójanme que me han matado, que me mató." ("Tato" era el apodo de Erasmo y "Tino" el de Celestino Valentín Cruz.) Erasmo echó a correr en dirección de su casa y en eso vió que el acusado Cecilio Cortés del Castillo salía por detrás de la casita corriendo hacia su almacén y llevando en la mano un revólver color negro parecido al que fué admitido en evidencia. Este revólver pertenecía a un hijo del acusado, y desde hacía tiempo aquél lo guardaba en el escritorio del almacén de su padre. Con dicho revólver se disparó la bala que penetró en el cuerpo de Gladys cerca de la línea axilar posterior, produciéndole una hemorragia intra–abdominal masiva que le ocasionó la muerte momentos después. Cuando Erasmo

llegó al portón de entrada de su casa, el acusado Cecilio Cortés del Castillo, le llamó, pero aquél le contestó que "ahorita vengo". Después de entrar a su casa, tomar agua y hablar con sus hermanas, Erasmo regresó donde estaba el acusado. Éste le preguntó que si él estaba allí cuando "le pasó esto a la hija mía" y al contestarle en la afirmativa el acusado le dijo: "pues si a tí te llevan a declarar mañana tú dices que ella se dió el tiro". El testigo Luis Moreno Medina declaró que vió a Gladys en la casita cuando ésta hablaba con Erasmo; que cuando regresaba de la casa de la esposa del acusado acompañado de un hijo de éste, sintió la explosión de un tiro que salía como de la casita y vió que en esos momentos el acusado Cecilio Cortés salía por detrás de la casita corriendo hacia la casa de concreto y al mismo tiempo vió a Gladys tendida en la acera de la casita. No vió quien hizo el disparo. Otro testigo, Benigno González Moya, declaró que esa tarde antes de ocurrir los hechos, vió al acusado dirigirse hacia la casita donde estaba Gladys y que había entrado a dicha casita por su parte de atrás. Hubo además prueba al efecto de que el arma homicida fué disparada a no menos de seis pulgadas del cuerpo de la interfecta. También hubo prueba de cargo tendiente a demostrar que después de los hechos, esa misma noche, el acusado registró la casita en unión a dos americanos que residían en los altos de su almacén y no encontraron armas, pero que posteriormente, la misma noche, mientras el Fiscal y el detective Rosario Maurás, registraban la casita, este último encontró un revólver Colt en medio de la sala, resultando dicho revólver ser el arma con la cual se disparó la bala que dió muerte a Gladys. Hubo además prueba sobre otros extremos, cuyo resumen omitimos en aras de la brevedad y por no ser necesario a los fines de la discusión de los errores que discutiremos más adelante.

Como puede verse, la prueba de cargo en este caso es circunstancial, ya que ninguno de los testigos del Pueblo vió

que el acusado disparara un arma de fuego contra su hija Gladys.

La teoría de la defensa fué que Gladys se había inferido ella misma la herida de bala, o sea, que se había suicidado, y además que el acusado no se encontraba en el sitio de los hechos cuando éstos ocurrieron, por lo que él no tuvo intervención ni responsabilidad por la muerte de su hija.

El testigo de descargo, Ángel M. Pesquera, perito químico y en balística declaró que a juicio suyo el agujero que presenta la blusa que Gladys vestía cuando fué herida, indica que es un tiro de contacto, o sea, pegado directamente al cuerpo.

El tercer señalamiento de error que hace el apelante en su alegato es como sigue:

"Cometió grave error el tribunal sentenciador, perjudicial a los derechos del acusado, al negarse a ordenar al fiscal entregar a la defensa para fines de impugnación las declaraciones del testigo Erasmo Gutiérrez Gutiérrez prestadas en la investigación del caso."

En la repregunta el testigo Erasmo Gutiérrez declaró que el día 20 de mayo de 1954, o sea, al día siguiente de haber ocurrido los hechos, lo vino a buscar el detective Maurás y lo llevó en un "jeep" al Cuartel de la Policía de Isabela. De allí volvieron al sitio de los hechos, a la casita, el testigo, Maurás y el Fiscal Archilla y regresaron de nuevo al Cuartel de Isabela donde Erasmo en seguida empezó a declarar en presencia del fiscal Archilla, el Juez de Paz de Isabela y una persona que escribía directamente a la maquinilla lo que Erasmo declaraba. Terminada su declaración, Erasmo la firmó.

Más tarde en el mismo contra-interrogatorio, este testigo declaró, a pesar de que lo había negado persistentemente, que como a las dos semanas de haber prestado declaración en el cuartel de Isabela fué llevado al edificio de la Corte Superior de Aguadilla y allí prestó otra declaración por es-

crito ante el fiscal Archilla, habiendo declarado lo mismo que en la primera. La defensa continuó su contrainterrogatorio y ocurrió lo siguiente:

"P.—¿Tato, es o no cierto .... dime si es cierto o no esto que te voy a preguntar: que en la declaración que tú le diste al Fiscal Archilla el día 20 de mayo de 1954, o sea al día siguiente de los sucesos, tú le dijiste al Fiscal que Gladys se había dado ella un tiro, ella misma?

"R.—Bueno, primeramente sí se lo dije; primeramente se lo dije.

"P.—Esta otra pregunta, Tato: ¿es o no cierto que en esa misma declaración, que fué la que tú le diste al Fiscal el día 20 de mayo del 54, tú le dijiste al Fiscal que tú no habías visto a don Cecilio?

"R.—No, señor; pero a mí no me dejan hablar tampoco; yo desearía hablar lo que yo sé también.

"P.—Contéstame la pregunta.

"R.—No, señor; no es cierto, pero yo desearía que me dejaran hablar.

"P.—¿Es o no cierto, Tato, que en esa declaración que tú le diste al Fiscal tú le dijiste que Gladys estaba parada en la puerta en la forma que tú le has dicho a estos doce caballeros en el día de ayer, o sea con su mano izquierda aguantándose aquí una cosa y con la mano derecha recostada en el marco de la puerta?

"R.—Sí, señor; eso se lo dije.

"P.—¿En la primera o en la segunda declaración?

"R.—En la primera.

"P.—¿Es o no cierto, Tato, que tú al Fiscal en la declaración del día 20 de mayo de 1954 no le dijiste que don Cecilio había hablado contigo y que te había dicho que tú dijeras que había sido Gladys que se había dado el tiro?

"R.—Sí, señor; se lo dije en la declaración.

"P.—¿Y es o no cierto que tú al Fiscal en tu declaración del día 20 de mayo en ningún momento le dijiste que viste a don Cecilio con el arma?

"R.—Sí, señor; se lo dije.

"Defensa.—Vamos a pedir a Vuestro Honor que ordene al Fiscal que produzca la declaración de este testigo a que hemos

hecho referencia y también la declaración prestada días después, dos semanas después, para los fines de impugnación al testigo.

"Hon. Juez.—Sin lugar ia solicitud.

"Defensa.—Con nuestra excepción. Nada más con el testigo." (T. E., págs. 464 a 466.)

Luego a preguntas del fiscal declaró:

"P.—Dile aquí a estos Señores del Jurado porqué de primera intención tú le dijiste a este Fiscal que ella se había pegado un tiro. Díselo aquí a los Señores del Jurado.

"R.—Yo primeramente le dije al Fiscal ia primera palabra que le dije porque el señor Cecilio Cortés me había amenazado que tenía que decir que ella se había dado un tiro pero cuando me dí cuenta que eso no era verdad, como yo soy religioso y sabía que algún día tenía que morir pues por eso dije la verdad.

"Sr. Fiscal.—Pues nada más con el testigo." (T. E., págs. 466 a 467.)

En un proceso criminal podrá impugnarse la veracidad de un testigo por la parte en cuya contra haya sido llamado a declarar, entre otros medios, mediante evidencia que demuestre que en ocasiones anteriores ha hecho manifestaciones incompatibles con su actual declaración; pero antes de hacerlo, se le referirán dichas manifestaciones, con expresión de la época, lugares y personas que hubieren estado presentes al hacerlas, y se le preguntará si dichas manifestaciones fueron hechas por él, permitiéndosele que las explique, si contestare afirmativamente. Si las manifestaciones fueren escritas, se enseñarán al testigo antes de interrogarlo acerca de ellas. Art. 521 del Código de Enjuiciamiento Civil (Ley de Evidencia), 32 L.P.R.A., sec. 2151; art. 245 del Código de Enjuiciamiento Criminal, 34 L.P.R.A., sec. 724. Al utilizar este medio para impugnar la veracidad de un testigo es indispensable que se hayan sentado las bases mediante el examen del testigo respecto a las supuestas manifestaciones inconsistentes suyas. *Pueblo* v. *Ayala*, 51 D.P.R. 560; *Pueblo* v. *Santiago*, 16 D.P.R. 469; *Pueblo* v. *Díaz*, 5 D.P.R. 202. Cuando la declaración anterior hubiese sido

prestada por escrito, ésta deberá demostrarse al testigo antes de que pueda ser interrogado en relación con la misma. *Pueblo* v. *Barrio*, 57 D.P.R. 942; *Pueblo* v. *Lebrón*, 61 D.P.R. 657; *Pueblo* v. *Torres*, 75 D.P.R. 231.

En el presente caso el juez sentenciador privó al acusado apelante de su derecho a impugnar la veracidad del testigo cumbre del Estado al negarse a ordenar al Fiscal que entregara a la defensa las declaraciones escritas prestadas en la investigación preliminar por Erasmo Gutiérrez. Este testigo admitió en su testimonio oral que primeramente le había declarado al Fiscal que Gladys se había dado ella misma un tiro. Luego explicó por qué hizo de primera intención esas manifestaciones al Fiscal. Además el testigo, negó haber hecho otras manifestaciones anteriores inconsistentes con su declaración en corte. Fué entonces cuando la defensa solicitó del tribunal que ordenara al Fiscal produjera las dos declaraciones escritas que el testigo había prestado anteriormente en la investigación preliminar. Dicha solicitud fué denegada y la defensa anotó una excepción.

Al sostener que el tribunal a quo no cometió error al así actuar, el apelado arguye que en este caso al igual que en el de *Pueblo* v. *Garcés*, 78 D.P.R. 102, es innecesario determinar si un fiscal puede ser obligado a entregar a la defensa una declaración escrita que está en su poder, prestada ante él por un testigo en la investigación preliminar de la causa, toda vez que aquí el acusado no sentó las bases adecuadas para la solicitud que hizo. Su contención es que aquí no se probó que las alegadas manifestaciones inconsistentes constaran en las declaraciones escritas que el testigo Erasmo Gutiérrez prestó ante el Fiscal sino que tales manifestaciones fueron hechas verbalmente al Fiscal con anterioridad al momento en que el testigo prestara la primera de dichas declaraciones escritas.

Como ya hemos visto la pregunta de la defensa respecto a las manifestaciones inconsistentes que el testigo admitió haber hecho, fué específica. Volvemos a copiarla:

"P.—¿Tato, es o no cierto .... dime si es cierto o no esto que te voy a preguntar: que en la declaración que tú diste al Fiscal Archilla el día 20 de mayo de 1954, o sea, al día siguiente de los sucesos, tú le dijiste al Fiscal que Gladys se había dado ella un tiro, ella misma?

"R.—Bueno, primeramente, sí se lo dije; primeramente se lo dije."

Hemos leído cuidadosamente la transcripción de las notas taquigráficas del juicio y nada encontramos en ella que demuestre que el testigo Erasmo Gutiérrez hubiera declarado verbalmente al Fiscal Archilla antes de prestar su primera declaración escrita. En ausencia de algún indicio en el récord de que ello ocurriera así, no debemos estimar como cierto, a base de meras especulaciones, que las manifestaciones inconsistentes del testigo respecto a que Gladys se había dado un tiro ella misma no constaban en los documentos solicitados por la defensa para impugnar su credibilidad.

Por otra parte, el hecho de que el testigo Erasmo Gutiérrez admitiera haber hecho declaraciones anteriores inconsistentes con su declaración oral, no era motivo para denegar la solicitud de la defensa. Ya en el caso de *Pueblo* v. *Lebrón*, 61 D.P.R. 657, dijimos que la declaración escrita, una vez admitida en evidencia, debe ser leída al jurado como la mejor evidencia de lo que el escrito contiene. Como se dijo en *Gordon* v. *United States*, 44 U.S. 414, 97 L. Ed. 447, "Creemos que la admisión de que un escrito contiene una contradicción no debe ser óbice a la admisión en evidencia del escrito mismo, siempre que éste cumpla con todos los otros requisitos para su admisibilidad y no se suscite contra el mismo ninguna alegación válida de privilegio. La sabiduría elemental de la regla sobre la mejor evidencia descansa en el hecho de que el documento es una fuente de información más confiable, completa y exacta en cuanto a su contenido y alcance que la descripción que cualquiera pueda hacer y esto no resulta menos cierto respecto al alcance y circunstancias de una contradicción." Véase además, *United*

*States* v. *Krulewitch,* 145 F.2d 76; "Admission by the witness of having made a contradictory statement is not a substitute for inspection," 45 Columbia Law Rev. 461.

La defensa sentó además las bases para impugnar al testigo sobre otros extremos importantes de su declaración. En esta ocasión, contestando una serie de preguntas en el contrainterrogatorio, el testigo negó haber hecho por escrito las manifestaciones inconsistentes que le atribuía la defensa.

Generalmente en un proceso criminal en esta jurisdicción las declaraciones juradas prestadas en la investigación fiscal están fuera del alcance del acusado. Esto es así, porque la investigación preliminar practicada por el fiscal es de carácter privado. *Pueblo* v. *Álvarez,* 70 D.P.R. 830; *Castro* v. *González,* 58 D.P.R. 368; *Sostre* v. *Calzada,* 33 D.P.R. 244; *Pueblo* v. *Beltrán,* 18 D.P.R. 944. Sin embargo, reiterando esta doctrina, dijimos en *López* v. *Tribunal Superior,* 79 D.P.R. 498, a la pág. 502, lo siguiente:

"En varias ocasiones hemos dicho que la investigación preliminar practicada por el fiscal es de carácter privado y no puede obligársele a mostrarla *a menos* que haya renunciado a ese privilegio o *el acusado necesite las declaraciones juradas prestadas en la investigación preliminar para fines de impugnar la credibilidad de los testigos durante el juicio.*" (Bastardillas nuestras.)

De suerte que la secretividad del sumario fiscal no es un impedimento absoluto para que el acusado lo utilice para fines de impugnación. De lo contrario, su derecho a impugnar los testigos de cargo mediante prueba de manifestaciones inconsistentes consagrado por la Ley de Evidencia y el Código de Enjuiciamiento Criminal, resultaría ilusorio en la mayoría de los casos.

En vista de lo expuesto anteriormente es forzoso concluir que el cuarto error fué cometido y siendo el mismo perjudicial a los derechos del acusado, la sentencia apelada debe ser revocada y ordenarse la celebración de un nuevo juicio. Véase *Pueblo* v. *Álvarez,* 70 D.P.R. 830 y *Maldonado* v. *Rebollar,* 75 D.P.R. 870.

█ Por el quinto señalamiento se imputa al Tribunal a quo haber cometido "grave error al no dar instrucciones al jurado de homicidio voluntario como veredicto".

El error no fué cometido. Nada hay en la prueba que tienda a demostrar que la muerte de Gladys fué ocasionada con motivo de una súbita pendencia o arrebato de cólera. Art. 203, Código Penal (33 L.P.R.A. sec. 635). Por el contrario la prueba creída por el jurado estableció claramente el delito de asesinato. En su consecuencia la corte no estaba obligada a dar instrucciones sobre homicidio. *Pueblo* v. *Ortiz*, 68 D.P.R. 681; *Pueblo* v. *Berdecia*, 59 D.P.R. 318; *Pueblo* v. *Calderón*, 50 D.P.R. 336; *Pueblo* v. *Negrón*, 37 D.P.R. 822; *Pueblo* v. *Rosado*, 17 D.P.R. 441, y máxime cuando el acusado negó haber dado muerte a su hija Gladys sosteniendo como teoría de defensa que él no se encontraba en el sitio de los hechos y que Gladys se había suicidado. *Pueblo* v. *Arroyo*, 61 D.P.R. 411. El apelante, sin embargo, arguye que siendo la prueba de cargo circunstancial y aun cuando se llegara a la conclusión de que fué él quien disparó, no hay absolutamente ninguna evidencia demostrativa de cuáles fueron las condiciones en las cuales el acusado hizo el disparo por lo que la determinación de dichas circunstancias puede hacerse únicamente a base de inferencias. Sostiene a renglón seguido que si los actos del acusado fueron deliberados o si fueron premeditados pero sin deliberación, son cuestiones de pura inferencia y que en su consecuencia no debe excluirse la posibilidad de que el acusado actuara en ocasión de un arrebato de cólera.

Discrepamos. En ausencia de prueba de que el apelante hizo el disparo en ocasión de un arrebato de cólera, cabe presumir que él actuó maliciosamente, *Pueblo* v. *Torres*, 75 D.P.R. 231; *Pueblo* v. *Méndez*, 74 D.P.R. 913.[1] Y según sabemos, el delito de homicidio consiste en dar muerte ilegal

---

[1] En el caso de *Méndez*, dijimos:
"Como ya hemos visto, se le informó al jurado que cuando la muerte de una persona resulta evidente y no hay ninguna circunstancia en la prueba que tenga por objeto mitigar, excusar o justificar el acto ejecutado por el que se acusa, entonces se presume la existencia de la malicia

a un ser humano sin que medie malicia. Claramente era improcedente en este caso una instrucción sobre el delito de homicidio como posible veredicto ya que de la prueba no surge que mediara notable provocación de parte de la víctima. *Pueblo* v. *Calderón*, supra.

█ El segundo error señalado por el apelante es como sigue:

"La publicidad excesiva con antelación al juicio, adversa al acusado, originada y estimulada por el Fiscal y otras autoridades, privó al acusado de un juicio justo e imparcial siendo por lo tanto su convicción en violación del debido procedimiento de ley."

Parece innecesario entrar a considerar este error. La cuestión enunciada en el mismo fué planteada por la defensa durante el proceso de desinsaculación del jurado los días 1 y 2 de marzo de 1955 cuando ya se había tomado juramento definitivo a ocho jurados. Se recordará que los hechos ocurrieron el día 19 de mayo de 1954 y que la información publicada por la prensa y trasmitida por la radio sobre los sucesos se hizo unos nueve meses antes de la celebración del juicio. Muchos de los jurados examinados afirmaron conocer la información publicada. Algunos manifestaron recordar lo que habían leído y escuchado. Otros manifestaron que no recordaban y aun otros afirmaron no haber leído ni escuchado esa información. Si bien algunos de los jurados manifestaron que tenían opinión formada y que esa opinión era definitiva e invariable, la mayoría de ellos sin embargo, manifestaron no tener opinión formada o que la que tenían no era invariable ni definitiva.

Eso ocurría unos nueve meses después de haberse hecho la información radial y periodística que el acusado alega le

---

tácita. Se le dijo también al jurado que cuando las circunstancias indican la muerte de un ser humano por otro, se presume la malicia. Esta última instrucción debe ser considerada conjuntamente con la anterior, o sea, que surge la presunción cuando en la prueba no hay circunstancias de mitigación, excusa o justificación. La instrucción trasmitida corresponde a la ley y a las disposiciones estatutarias prevalecientes en esta jurisdicción." (74 D.P.R. 927).

fué perjudicial. Como el nuevo juicio que estamos ordenando habrá de celebrarse cuando ya habrán transcurrido más de dos años y medio de haberse publicado la alegada información perjudicial al acusado, no estamos ahora en condiciones de anticipar que dicho acusado no habrá de tener un juicio justo e imparcial en la Sala de Aguadilla del Tribunal Superior como consecuencia de la aludida información. Por tanto la decisión de la cuestión de si la indicada publicidad perjudicó adversamente al acusado y como consecuencia de ello él no tuvo un juicio justo e imparcial, carece de finalidad práctica.

En el noveno señalamiento se alega que el tribunal a quo cometió error de derecho al condenar al acusado por infracción del art. 6 de la Ley de Armas.

No podemos convenir con el apelante en que no hubo evidencia sobre posesión ilegal. Por el contrario, la presentada por el Estado y admitida por la corte es suficiente para sostener la convicción del acusado por el delito imputádole. Véase *Pueblo* v. *Rivera*, 60 D.P.R. 743. Sin embargo, en vista del error cometido por el tribunal sentenciador en relación con el testimonio de Erasmo Gutiérrez, que resulta ser el testigo principal de cargo en el proceso por infracción a la Ley de Armas, la sentencia apelada será revocada y se ordenará la celebración de un nuevo juicio.

En vista del resultado a que hemos llegado, sería fútil entrar a considerar los restantes errores señalados por el apelante.

*Se revocan las sentencias apeladas y se ordena la celebración de un nuevo juicio en cada una de las causas.*

El Juez Presidente Sr. Snyder disintió.

El Juez Asociado Sr. Negrón Fernández no intervino.

El Juez Asociado Sr. Sifre concurre en el resultado.