EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JULIO FIGUEROA MUÑOZ, acusado y apelante.

*Número:* 16511    *Resuelto:* 26 de junio de 1963

*Guillermo S. Pierluisi,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* y *Rodolfo Cruz Contreras, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

PER CURIAM: El apelante fue convicto por un jurado de asesinato en segundo grado. En su apelación levanta los siguientes errores:

a) Que el Tribunal "cometió grave error al permitir introducir en evidencia a través del testimonio del testigo José A. Nazario, Teniente de la Policía Estatal que intervino con él en la investigación, una serie de supuestas admisiones por conducta del acusado, obtenidas mediante coacción sicológica y arresto ilegal del propio fiscal acusador, supuestas admisiones por conducta que tendían a impresionar al Jurado en contra del acusado, y sobre todo cuando la conducta del Fiscal al obtener dichas admisiones, a través de un interrogatorio ilegal del acusado en el curso de la investigación, violó el derecho constitucional del acusado de no ser obligado a incriminarse mediante su propio testimonio."

■ En adición a las admisiones a que alude el señalamiento de error anterior, se admitió en evidencia con la afirmativa aceptación del acusado una primera declaración ju· rada suya en donde expuso lo siguiente:

"Regresé de Sábana Llana y seguí directamente y sin entrar al bar, para Luquillo a los fines de llevar el muchacho que andaba conmigo y que se llama Félix López, quien reside en la playa de Luquillo y es la persona que me tumba los cocos y los recoge. Era como las ocho de la noche cuando llegué a Luquillo y allí me encontré con Don Jesús Suárez y con Don Rafael Escobar, en un bar que se llama Los Mangos; estuve con ellos un rato y nos dimos unas cervezas; de allí salimos como a eso de las doce y pico para mi negocio; en mi negocio estuvimos los tres tomando como hasta las tres de la madrugada más o menos, y entonces ellos se fueron y quedamos Ana Angélica y yo solos en el Bar; yo empecé a cerrar el negocio y ella se puso a cuadrar la caja; una vez todo estuvo terminado y cuando ya nos disponíamos a salir, yo la invité a que nos diéramos una cerveza; ella estaba acostada en una hamaca, cuando se estaba tomando la cerveza y en eso se levantó y cuando iba hacia la cantina, se cayó y se dio con el mostrador; entonces yo la cogí y la senté en una caja de

cartón que había cerca; estuve un rato con ella y la llamaba, pero no me respondía; al notar que estaba muerta, me fui a buscar los familiares y entonces tuve un accidente, en el cruce de Isla Verde. Dejé mi guagua abandonada, porque un señor se me armó con la llave y seguí para avisar a los familiares. Fui con este señor que está aquí y que ahora sé que se llama, RAMÓN JIMÉNEZ GONZÁLEZ y les avisé. Conmigo se vino la hermana; entonces fui a buscar el doctor, y éste ordenó el levantamiento del cadáver y que lo trasladaran a la funeraria. El Dr. que ordenó el levantamiento del cadáver fue el Dr. Robles quien trabaja en el Hospital Municipal de Conóvanas.

"FISCAL: Julio el día 18 de marzo de 1957 tuviste alguna discusión con Angelina Vélez Sánchez?

"TESTIGO: No tuve ninguna discusión con ella el día antes de la muerte ni tampoco me expresó que tuviera intenciones de suicidarse. Que hacía como cuatro o cinco meses que vivía con ella y nos llevábamos bien. Yo desconozco la causa de la muerte de ella."

Se admitió también por estipulación de las partes la declaración jurada escrita de la hermana de la interfecta, en donde aquella expone que el martes 19 de marzo de 1957 como a las ocho y media de la mañana llegó a su casa el apelante Julio Figueroa Muñoz quien vivía maritalmente con su hermana Ana Angélica Vélez Sánchez; que ella preguntó qué pasaba y Julio Figueroa Muñoz estaba llorando y no podía explicarle; que fueron al Bar Camarero y cuando llegaron Julio empezó a llorar y por el camino él le había dicho "que por la noche cuando ya iban a cerrar el negocio, Ana Angélica, estaba sentada en una hamaca y él le había dicho que se tomaran las últimas cervezas antes de cerrar, y cuando ella fue a servir la cerveza, se esmongó y se cayó. Que él la recogió y la sentó en unas cajas que hay detrás del mostrador. Allí la encontré yo, sentada sobre una caja y recostada sobre otras cajas que habían al lado, en forma de estiba. Yo me puse nerviosa y empecé a llorar y Julio también empezó a llorar, y le decía: 'Angélica, Angélica, ya no me contestarás nunca.' En eso un

muchacho que se llama Arturo que había ido conmigo me dijo que qué hacíamos, que si iba a buscar al doctor y yo le dije que sí y él fue a buscar al médico. Mientras tanto, Julio decía: 'A lo mejor creerán que yo la maté.' También decía: 'Que dirá Eduardo cuando sepa de esto.' Eduardo es mi hermano. En eso llegó el médico y la levantaron de las cajas donde estaba y la pusieron en una camilla y como Don Julio estaba llorando el doctor le dijo: 'No te apures que tú no tienes culpa de esto.' En eso llegó la policía y ya la ambulancia se había llevado a Ana Angélica."

Al día siguiente, después de haber ocurrido ciertos hechos, entre ellos la detención continua del acusado y su confrontación con el cadáver de Ana Angélica para que presenciara la lesión violenta que ella tenía en el centro del cráneo con fractura conminuta, el acusado prestó una segunda declaración que luego no firmó y que la Sala se negó a admitir en evidencia. A través del testimonio del Teniente Nazario quien estaba presente cuando el acusado exponía esta segunda declaración, el Fiscal produjo evidencia de lo que el apelante había manifestado. Dijo el Teniente que el acusado había declarado en esta segunda ocasión que él no había tomado cerveza en su negocio hasta las dos o las tres de la madrugada, las tomó con amigos en el bar Los Mangos. Que después que se fueron los amigos quedó él con su empleada Ana Angélica Vélez, solos, y después de cuadrar la caja y disponerse a salir la invitó a que sirviera unas cervezas "y que cuando ella se levantó de una hamaca para venir a buscar las cervezas, al llegar cerca del mostrador se cayó; como que le dio un síncope y él la agarró y la ayudó hasta sentarla en unas cajas de cartón que había dentro, a la entrada de la barra."

Puede notarse que lo dicho por el acusado la segunda vez, traído al récord por vía de admisión, no se aparta esencialmente de lo dicho por él en su declaración anterior que fue admitida con su aceptación expresa. No obstante, hemos examinado detenidamente el récord y no hay base para con-

cluir que el acusado fuera víctima de coacción sicológica por los hechos que ocurrieron antes de que se manifestara la segunda vez. Hemos examinado la situación también en cuanto al hecho de si a él se le obligó a incriminarse o si en alguna forma se usó indebidamente su derecho a permanecer callado, a la luz de nuestra reciente expresión sobre la materia en *Pueblo* v. *Alvarez Trinidad*, 85 D.P.R. 593 (1962), y no creemos que se conculcaran los derechos constitucionales del apelante o que su condena, considerando el récord en su integridad, fuera el resultado de un proceso injusto.

■ Por el segundo error se ataca la admisión de la declaración en juicio del Doctor Bolívar Patiño Arca sobre el resultado de la autopsia que practicó a la interfecta, por el hecho de que no se estableció previamente las diligencias y cuidados que se tomaron con el cadáver. El Dr. Patiño declaró detalladamente sobre las condiciones exteriores del cadáver y dijo que no presentaba signo alguno de violencia, excepto el descubrimiento que hizo de una lesión en el cráneo no visible. El récord demuestra que de inmediato se expidió un certificado de muerte por causa desconocida y se llevó el cadáver a una funeraria. Según progresó la investigación se dispuso que se trasladara el cadáver al Hospital de Distrito de Fajardo donde se practicó la autopsia. Esas circunstancias no hacían inadmisible en derecho la declaración del médico sobre la autopsia realizada, aparte de que la admisión de la misma no fue en forma alguna objetada.

■ En el tercer error se impugnan ciertas instrucciones por ambiguas, confusas e imprecisas. Las instrucciones impugnadas son las siguientes: "Si los señores del jurado creen, por el resultado de la prueba, *fuera de duda razonable*, que no se ha cometido ningún delito en este caso, o que no se ha justificado plenamente que la muerte de Ana Angélica Vélez Sánchez se debiera a acto alguno del acusado, o si creen que no se ha probado en manera alguna su culpabilidad, o si tienen duda de ella, duda razonable y fundada, entonces, en cuales-

quiera de estos casos, el Jurado debe declarar al acusado no culpable."

Convenimos en que el Juez no debió haber intercalado la frase subrayada en ese sitio, pero ello no le pudo causar perjuicio al apelante, ni es motivo para revocar, cuando se consideran las instrucciones en su totalidad, siendo un hecho que en adición a la materia anteriormente transcrita el Juez dio amplias y completas instrucciones sobre la duda razonable, la presunción de inocencia del acusado, y la obligación del Pueblo de probar el caso más allá de tal duda. Cualquier peligro momentáneo, si es que pudo haberlo, quedó inmediatamente disipado al final de la propia instrucción transcrita.

■ En el cuarto error se levanta el punto de que no se dieron al jurado instrucciones sobre homicidio. Aparte de que tales instrucciones no fueron solicitadas, de constituir tal omisión un error fundamental y perjudicial al acusado no vacilaríamos en considerarlo y revocar la sentencia. La única prueba directa de cómo ocurrió la muerte así como las demás circunstancias que aparecen del récord no dan base para una instrucción de homicidio. Cf. *Pueblo* v. *Cortés*, 79 D.P.R. 818 (1957).

■ En el quinto señalamiento de error se pide la revocación de la sentencia porque no se le preguntó al jurado si habían sido convictos de delito grave. El récord ante nos no contiene los incidentes en cuanto a la insaculación y cualificación del jurado. No podemos determinar que tal pregunta no se hizo y aunque no se hiciera, presumir que sirvió en el jurado una persona convicta de delito grave. Si esa era la situación el acusado ha debido hacerle el planteamiento al Tribunal de instancia por lo menos en una moción de nuevo juicio, donde se hubiera podido dilucidar el hecho. No hay motivo para una revocación por el fundamento de este error. Cf. *Pueblo* v. *Ramírez*, 50 D.P.R. 234, 274–275 (1936).

■ Con este caso de prueba circunstancial el Jurado tuvo ante sí una versión de cómo ocurrió la muerte traída por el

Pueblo a través de las manifestaciones del propio acusado en su declaración por escrito, y tuvo ante sí también todas las demás circunstancias tendentes a demostrar que hubo una muerte violenta, de mano criminal. Entre esas circunstancias está el violento golpe que tenía la interfecta en el centro de la cabeza, que causó la fractura conminuta del cráneo y hemorragia, golpe éste que según el médico tenía que haberse dado con un instrumento contundente, y con gran fuerza, y que no pudo ser causado por una caída de la interfecta como consecuencia de un síncope, o de un mareo, aun cuando al caer chocara con algo. El jurado pesó la prueba, y con unas instrucciones que fueron claras y correctas, llegó a la conclusión de que el acusado era culpable de este hecho.

*La sentencia apelada se confirmará.*